[No. A055941. First Dist., Div. Two. Feb. 1, 1993.]

THE PEOPLE, Plaintiff and Appellant, v.
SHERI ANN WOODS, Defendant and Respondent.

[No. A056503. First Dist., Div. Two. Feb. 1, 1993.]

In re SHERI ANN WOODS on Habeas Corpus.

COUNSEL

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Mark S. Howell and Gerald A. Engler, Deputy Attorneys General, Thomas H. Gordinier, County Counsel, Vicki Sieber-Benson, Assistant County Counsel, and Catherine P. Bernstein, Deputy County Counsel, for Plaintiff and Appellant.

Louisa Havstad, under appointment by the Court of Appeal, for Defendant and Respondent.

OPINION

SMITH, J.—The People appeal from a superior court order dismissing a murder prosecution against defendant Sheri Ann Woods. The issue is whether either of two prior dismissals was due to excusable neglect, thus allowing the People a third filing under Penal Code section 1387.1.[1] We reverse the order and deny as moot a petition for writ of habeas corpus in which Woods challenges her custody status pending the appeal.

BACKGROUND

We summarize the evidence before Municipal Court Judge Allan P. Carter, who considered and granted the People's motion to allow a third criminal complaint to be filed. As we explain in part I of this opinion, it is

---

[1]All further section references are to the Penal Code. The appeal lies as from an order setting aside an information. (§ 1238, subd. (a)(1).)

Judge Carter's ruling to which we must defer in our review of Superior Court Judge James F. Moelk's later, contrary ruling.

### First Filing

Woods and codefendant Robert F. Brunner were charged by complaint in February 1991 with the January 21st murders of Vincent Jay Benavidez (count 1) and John Madison (count 2), with firearm-use enhancements (§ 12022.5) and a multiple-murder special circumstance alleged (§ 190.2, subd. (a)(3)). Both defendants were held to answer after a preliminary hearing and charged by information in superior court.

On July 1, the court (Judge Moelk) granted Woods's motion to sever her trial from Brunner's. Woods's counsel was Deputy Public Defender Lorraine Voss. The People were represented by Deputy District Attorney Kathy Coffer, who had stepped in two or three weeks before due to a first deputy's schedule conflict.

On the first day set for trial, July 8, the People were unable to locate an essential witness and so opted to have the court dismiss and then refile once the witness was found. The witness was found and arrested on a material-witness warrant the next day.

### Second Filing

A complaint prepared at Ms. Coffer's direction was filed in municipal court on July 10. The secretary who prepared it was reliable, in Coffer's experience, and she was directed to charge the two murders and special circumstance, as before. Unfortunately, a word processing error left the first sentence of count 2 clipped so that language alleging the murder of John Madison was omitted.[2] Coffer read the first count, which was complete, but only glanced at the second and did not notice the error. She was relying on the office word processor's accurate retrieval as well as the secretary's past accuracy.

The first to notice was Judge Franklin R. Taft at the preliminary hearing on July 24 and 25. He issued holding orders on both counts after calling both

---

[2]Count 2 read: "On or about January 21, 1991, in the above named Judicial District, the crime of Spec Alleg-Multiple Murder, in violation of Penal Code Section 187(a), a Felony, was committed by Sheri Ann Woods, who It is further alleged that the offenses charged in counts I and II are a special circumstance within the meaning of Penal Code Section 190.2(a)(3). [¶] It is further alleged that in the commission and attempted commission of the above offense, the said defendant, Sheri Ann Woods, personally used a firearm(s) within the meaning of Penal Code Sections 1203.06(a)(1) and 12022.5 and also causing the above offense to become a serious felony pursuant to Penal Code Section 1192.7(c)(8)."

Missing from the end of the first sentence was language from the first complaint, "did willfully, unlawfully, and with malice aforethought murder John Madison, a human being."

sides' attention to the defect and in an untranscribed part of the proceeding amending the complaint on its face to correct it.

Coffer ordinarily headed the office's sexual assault unit, and she was reassigned by her supervisor to other matters just two days after the preliminary hearing. However, she gave written instructions on the reverse side of a transmittal sheet directing the preparation of a two-count information charging the murders of both Benavidez (as count 2 this time) and Madison (count 1), again with the use and multiple-murder allegations. She signed the new information, which was prepared by one of two other secretaries who had "for the most part" done accurate work for her, and it was ultimately filed on July 30. She had read count I, had seen that it was complete and accurate, and had thought she also saw that the second count properly named the victim. In fact, the new information had the Benavidez murder in count 1, as before, and the same defect as before: count 2 failed to include the Madison language. "It was neglect on my part," she explained below, "I did not catch it, and after I signed it that is the last I had any contact with that case." She had known since before the preliminary that the case would be reassigned.

The case was assigned on August 11 to Deputy District Attorney James A. Highsmith, and the case was set for trial on September 23. Highsmith had also been assigned the Brunner case, which was set to go to trial on August 17. He spent most of his time in August engaged in the Brunner trial, which ended at the close of August with jury verdicts of first and second degree murder and a multiple-murder special circumstance. (The People opted not to seek the death penalty.) Highsmith met with Voss for discovery on the Woods case during that time. He also responded to her inquiry about penalty by filing, on August 15, a notice of intention not to seek the death penalty.

Highsmith went on vacation between September 9 and 17, leaving a calendar deputy, Gary Sherrer, to appear for him at a readiness conference in the Woods case on September 13. At the hearing, Judge Dwight C. Ely noted that the information appeared to be "fouled up" but confirmed the trial date when Ms. Voss replied: "It's the same as filed below. They are aware of it, and Mr. Highsmith is on vacation right now."[3]

Sherrer wrote a note to Highsmith on a "D.A. form 04" and gave it to a secretary to place in the file. It read in part: "Attn JAH . . . Court sez Ct 2

---

[3]"THE COURT: May I throw another slight monkey wrench in this?

"In trying to figure what this case was about, I looked in the information and it certainly appears to be fouled up.

"MR. SHERRER: I am in a position, your Honor, that I—

"THE COURT: You don't even have a file.

does not make sense." A secretary put the note in the " 'Woods and Brunner' " file on a table in Highsmith's office. It was misdirected, however, as a separate file for the Woods case had been kept ever since that case was severed from Brunner's. Thus Highsmith never got the message. He once used the *back* of the note as scratch paper when responding to a new trial motion in the Brunner case, but did not discover its significance. Sherrer explained below that he might have personally placed such a note in a conspicuous place for the attorney to find. He did not this time, however, "because of Ms. Voss' statement at the time . . . to the effect that they knew about it, and it was my impression that they had been talking about that and other things based upon her statement in court."

Highsmith knew nothing of the defect. He understood that Judge Ely had confirmed the trial date, but he did not read the misfiled note or speak with Sherrer or Voss about a charging defect. Voss, in fact, had asked him about pursuing the death penalty, which made sense only if multiple murders were charged. Highsmith had seen the information but, having just prosecuted the Brunner trial on the same murders originally charged against both defendants jointly, did not check as carefully as he should have. He read count 1 and saw that it was accurate. Then, he testified, "I glanced at Count 2 and in caps I saw, 'multiple murder,' I assumed Madison was in there, and it was an incorrect assumption."

The Woods trial date was moved to September 30 due to illness requiring the hospitalization of defense counsel Voss, and the trial was assigned to Judge William C. Harrison. Voss insisted on no time waiver. That morning, when Judge Harrison read the information aloud in chambers, Highsmith first became aware of the defect. He immediately sought leave to amend, and a hearing on the motion was held that afternoon. Voss opposed amendment, arguing that she had assumed from the defect that only count 1 was being prosecuted and that she was not prepared to proceed on count 2. Judge Harrison found "a little bit of game playing" in Voss's claim of surprise but reasoned that she had no duty to call the defect to anyone's attention. He denied leave to amend and, based on Voss's "no time waiver" stance, denied a request for a continuance to meet the amendment.

Faced with the choice of proceeding on only one count and forfeiting the multiple-murder special circumstance or seeking writ review of the leave-to-amend ruling, Highsmith's supervisor opted to dismiss once again and refile

"MR. SHERRER: This case is assigned to Mr. Highsmith. He previously tried the co-defendant, [Brunner], And as I understand, the jury verdict was one count of first degree murder and one count of second degree. I don't know much more about what's going on in this case.

"THE COURT: Have you looked at the information, Count 2?

"Ms. Voss: I have, your Honor. It's the same as filed below. They are aware of it, and Mr. Highsmith is on vacation right now.

"THE COURT: All I will do is confirm the trial date."

under section 1387.1, an option that Judge Harrison had suggested. The case was dismissed, and Woods was immediately rearrested for arraignment the next day.

### Third Filing

The evidence above was considered by Judge Carter at an October 11 hearing in municipal court on the People's motion to file a third (and this time correct) complaint. Attorneys Voss, Highsmith and Sherrer each testified. Judge Carter granted the motion, finding excusable neglect in the second dismissal, no prejudice to Woods and no bad faith by the People. Woods was held to answer after another preliminary hearing, and a correct information was filed on October 28.

On November 12, Woods filed in superior court a "De Novo Motion to Dismiss Under § 1387 P.C." which in essence was a challenge to Judge Carter's ruling. Judge Moelk heard the matter on December 4. He declined to review the question de novo and took no new evidence. However, based on the transcript of the section 1387.1 hearing and all of the same documents considered by Judge Carter, he held that the findings were not supported by the evidence—that there was "no excusable neglect shown." He granted the motion and ordered the information dismissed. The People appeal from that order.

### DISCUSSION

### I

The parties disagree on the standard of review. We agree with the People that we should defer to the magistrate's ruling and not defer to the superior court's contrary ruling. This is because only the magistrate heard the evidence, saw the demeanor of witnesses and was in a position to judge credibility. The superior court sat only as a court of review, examining the magistrate's ruling for evidentiary support and declining to reweigh or take new evidence. The situation is like review of a motion to set aside an information (§ 995) or to suppress evidence where the superior court considers only that evidence presented on a prior motion before the magistrate (§ 1538.5). In either case this court disregards the superior court ruling and directly examines the magistrate's. (*People* v. *Trujillo* (1990) 217 Cal.App.3d 1219, 1223 [266 Cal.Rptr. 473] [§ 1538.5]; *People* v. *Shepard* (1991) 228 Cal.App.3d 1410, 1414-1416 [279 Cal.Rptr. 551] [§ 995].) We, like the superior court, must draw every legitimate inference in favor of the magistrate's ruling and cannot substitute our judgment, on the credibility or

weight of the evidence, for that of the magistrate. (*People* v. *Laiwa* (1983) 34 Cal.3d 711, 718 [195 Cal.Rptr. 503, 669 P.2d 1278].)

Woods's arguments to the contrary are not convincing. Her first is fatuous. She opposes deferring to the magistrate as a "trial court" in the matter because a municipal court has no jurisdiction to *try* a felony (§ 860). This is a word game. Trial of the motion, not the charges, is the issue.

She next argues that she was entitled to a de novo hearing in superior court. For this she relies on cases holding that when a statutory provision bars the prosecution of a crime, the provision is cognizable as a proper basis for setting aside an information before trial, even though not made a ground under section 995. (See, e.g., *People* v. *McGee* (1977) 19 Cal.3d 948, 967-968 & fn. 9 [140 Cal.Rptr. 657, 568 P.2d 382] [state's failure to seek restitution]; see also *Murgia* v. *Municipal Court* (1975) 15 Cal.3d 286, 293-294, fn. 4 [124 Cal.Rptr. 204, 540 P.2d 44] [unconstitutional discriminatory prosecution]; *Jones* v. *Superior Court* (1970) 3 Cal.3d 734, 738-739 [91 Cal.Rptr. 578, 478 P.2d 10] [pre-arrest delay violating constitutional right to speedy trial].) The argument is beside the point. We do not hold that a superior court may not adjudicate a section 1387.1 issue, only that when the issue is raised first in the municipal court—the obvious forum for a motion to refile—the defendant cannot relitigate the matter *de novo* in superior court. Nothing in section 1387.1 or policy suggests that the matter should have been fully retried. Woods does not claim she was denied the chance to fully present her case the first time; she in fact offered nothing new the second time.[4]

Moreover, it is difficult to see what the argument gains Woods here, where the superior court expressly declined to decide the issue de novo. To treat that ruling as if made de novo would be a complete fiction.

## II

Section 1387.1, enacted effective January 1988, carves an exception to the general rule of section 1387 that a twice dismissed action cannot be refiled. It applies only to prosecutions of "violent felonies" such as the murders charged here (§ 667.5) and allows a third filing where (1) either of the prior dismissals was "due solely to excusable neglect" and (2) the conduct of the

---

[4]The statutory ground of "excusable neglect" at issue here differs from the problem of precomplaint, pre-arrest delay in *People* v. *McCoy* (1983) 147 Cal.App.3d 638 [195 Cal.Rptr. 285], where the defendant was held erroneously deprived of de novo review in the superior court. The opinion relied on the constitutional right involved and on the common law tradition of allowing de novo review. No constitutional issue or case law history of de novo review is present here.

prosecution did not amount to "bad faith." " 'Excusable neglect' " is broadly defined as including, but not limited to, "error on the part of the court, prosecution, law enforcement agency, or witnesses."[5]

Judge Carter expressly found that there was no bad faith in this case, Judge Moelk upheld that determination, and the issue appears to be conceded on appeal. ■ The dispute centers on "excusable neglect."

The only published opinion to consider that term as used in section 1387.1 decided that it has the same established meaning here as it has in other codes, where it has appeared and been construed for years. " 'Excusable neglect' is a legal term of art common in the law. Judicial interpretations guide us in determining whether [a dismissal] was due solely to excusable neglect." (*Tapp* v. *Superior Court* (1989) 216 Cal.App.3d 1030, 1036 [265 Cal.Rptr. 267].) Simply expressed, "[e]xcusable neglect is neglect that might have been the act or omission of a reasonably prudent person under the same or similar circumstances." (*Ebersol* v. *Cowan* (1983) 35 Cal.3d 427, 435 [197 Cal.Rptr. 601, 673 P.2d 271], citation omitted.) This case involves a remedial statute and omissions mainly by attorneys. "In deciding whether counsel's error is excusable, this court looks to: (1) the nature of the mistake or neglect; and (2) whether counsel was otherwise diligent . . . . In examining the mistake or neglect, the court inquires whether 'a reasonably prudent person under the same or similar circumstances' might have made the same error. . . . In addition, '[u]nless inexcusable neglect is clear, the policy favoring trial on the merits prevails.' . . ." (*Bettencourt* v. *Los Rios Community College Dist.* (1986) 42 Cal.3d 270, 276 [228 Cal.Rptr. 190, 721 P.2d 71], citations omitted.)

■ The application of section 1387.1 is a discretionary decision for the judge which should be afforded great weight unless a clear abuse of that discretion is demonstrated. We do not exercise " 'independent review.' " (*Tapp* v. *Superior Court, supra,* 216 Cal.App.3d 1030, 1036, fn. 3.) Nor, as

[5]Section 1387 provides in part: "(a) An order terminating an action pursuant to this chapter, or Section 859b, 861, 871, or 995, is a bar to any other prosecution for the same offense if it is a felony . . . and the action has been previously terminated pursuant to this chapter, or Section 859b, 861, 871, or 995, . . . except in those felony cases . . . where subsequent to the dismissal of the felony . . . the judge or magistrate finds any of the following: [¶] . . . ."

Section 1387.1 provides: "(a) Where an offense is a violent felony, as defined in Section 667.5 and the prosecution has had two prior dismissals, as defined in Section 1387, the people shall be permitted one additional opportunity to refile charges where either of the prior dismissals under Section 1387 were due solely to excusable neglect. In no case shall the additional refiling of charges provided under this section be permitted where the conduct of the prosecution amounted to bad faith. [¶] (b) As used in this section, 'excusable neglect' includes, but is not limited to, error on the part of the court, prosecution, law enforcement agency, or witnesses."

Woods urges, is this a case which poses only a question of how to apply the law to uncontradicted facts. The historical facts are in some ways uncontradicted, but the record is rife with contradictory *inferences* to be drawn from them. The facts are therefore not " 'undisputed.' " (*People* v. *Lee* (1987) 194 Cal.App.3d 975, 981 [240 Cal.Rptr. 32].)

■ The first negligent omission leading to the second dismissal was Kathy Coffer's failure to catch the omission in the second complaint. She did read the complaint but failed to read count 2 carefully enough to notice a word processing error which clipped the murder allegations and victim John Madison's name from the end of the first sentence. We find ample support for this being excusable neglect. She had orally instructed a trusted, proven secretary in the office to prepare the pleading, and the prior complaint by which both Woods and the codefendant were initially charged, had been correct. Coffer read the first count, found it complete and paid less attention to the second. She relied in part on the accuracy of the computer's retrieval capabilities. The error was buried in mid-paragraph, after a reference to murder and section 187, and later language stating the multiple-murder and firearm allegations (see fn. 2, *ante*) suggested completeness. A reasonably prudent person might have made the same mistake in the circumstances.

More troubling is her failure to catch the identical error in the second information. The complaint was brought to her attention by the magistrate at the preliminary hearing, who amended the pleading and held Woods to answer, and Coffer signed a defective information just five days later. However, drawing all inferences in favor of the ruling, we find support for an excusable-neglect finding. Coffer took care this time to give good *written* directions and used a different secretary. The directions specified that the counts be drafted in reverse order—the formerly defective Madison count first and the other count second. Coffer knew since before the preliminary hearing that she would be taken off the case, and the magistrate could infer that once the reassignment occurred, soon afterward, she began devoting her energy to other cases. By the time the information was prepared and filed days later, she would have been less focused on the case yet would have remembered her instructions to place the defective count first. She testified that she read the first count, saw it was complete, and *thought* she saw a complete second count as well. The record is not developed on this point, but we may infer that her focus was on the first count, where she directed the secretary to place the Madison allegations. Then, not noticing that the counts were *not* reversed as she had instructed, she assumed upon reading the complete first count that the problem had been cured. This, of course, implies fault of another sort but explains how the same error could happen twice.

James Highsmith, the next attorney on the case, also neglected to find the problem. However, as with Coffer, his oversight is understandable in that he could rely on the charges being in order, as they had been before the severance and first dismissal. This is especially true for Highsmith, who tried the severed case of Brunner on identical allegations drafted by the same office on the same computers. The error was buried in language which otherwise looked complete, and he had no reason to suspect error. He had worked with opposing counsel Voss, who hid her knowledge of the defect from him until the morning of trial, even asking for a statement of intent on death penalty as if both counts and the multiple-murder allegations were all in order. He never saw the mislaid note from Sherrer either, although he scribbled on the back of it while working on a motion for new trial in the Brunner case. The note as introduced below at the hearing was crumpled. Highsmith said that when he first discovered the note after the trial judge had disclosed the problem, he wadded it up in anger and threw it against the wall.

Highsmith made prompt efforts to avoid harm once he discovered the defect, including seeking leave to amend and a continuance. The People urge that Judge Harrison's denial of leave to amend was an abuse of discretion, apparently inviting us to conclude that this was "error on the part of the court" within section 1387.1's definition of excusable neglect (fn. 5, *ante*). However, we need not do so to sustain the magistrate's ruling. It is enough to observe that Highsmith's overall performance in this case was diligent, which bears on whether his single area of neglect here was excusable. (*Bettencourt* v. *Los Rios Community College Dist.*, *supra*, 42 Cal.3d 270, 276.) The dissent makes much of Highsmith's comment that he sometimes "shot from the hip," forgetting that Highsmith was referring to codefendant Brunner's separate trial.

Next, we find support that Sherrer was excusably negligent. He relied on Voss saying in open court that "they" (the prosecution) knew about the defect. He wrote a note and had it placed in the file, apparently unaware that a secretary placed it in the wrong one. Any neglect was excusable.

 Woods argues that the magistrate made "a fundamental error of law" by citing lack of prejudice in its oral comments. We see no error. Prejudice has been called irrelevant because, strictly speaking, it cannot make inexcusable conduct excusable (*Carroll* v. *Abbott Laboratories, Inc.* (1982) 32 Cal.3d 892, 900 [187 Cal.Rptr. 592, 654 P.2d 775]) or vice versa (*Iott* v. *Franklin* (1988) 206 Cal.App.3d 521, 531 [253 Cal.Rptr. 635]). On the other hand, it has been called relevant to the underlying policies promoting substantial justice and favoring trial on the merits. "Reversal is particularly appropriate where relieving the default will not seriously prejudice the

opposing party. [Citations.]" (*Elston* v. *City of Turlock* (1985) 38 Cal.3d 227, 235 [211 Cal.Rptr. 416, 695 P.2d 713].) "Reversal of an order denying relief is appropriate where the effect of the order is to 'defeat, rather than to advance the ends of justice.' [Citation.]" (*Id.*, at p. 236.)

Thus, the magistrate was right to view lack of prejudice as relevant, and we defer to his supported views on the matter: "[T]here was no surprise [to Woods], and if the third refiling is allowed she will be facing, once more, the charges she already knew about and decided to ignore in Superior Court"; "the refiling of the charges of which [she] was already aware and prepared to defend inflicts no prejudice on her."[6]

Our colleague's dissent rests on his view that the magistrate erroneously failed to reach the question of excusable neglect. The argument is easily rebutted. Our starting point is the presumption that duty was regularly performed. (Evid. Code, § 664.) In this case, the presumption is that the magistrate knew and properly applied the law. It is an appellant's burden to overcome the regularity presumption by an affirmative showing. (*Ross* v. *Superior Court* (1977) 19 Cal.3d 899, 913, 915 [141 Cal.Rptr. 133, 569 P.2d 727]; *People* v. *Mack* (1986) 178 Cal.App.3d 1026, 1032 [224 Cal.Rptr. 208]; *People* v. *Castellano* (1983) 140 Cal.App.3d 608, 612 [189 Cal.Rptr. 692].) ██ Woods is not the appellant here but, as respondent, may raise her own points of error in defense of the superior court judgment. In this way she may attempt to show that these additional errors compel an affirmance of the superior court. (*People* v. *Osuna* (1986) 187 Cal.App.3d 845, 848, fn. 2 [232 Cal.Rptr. 220]; cf. *People* v. *Braeseke* (1979) 25 Cal.3d 691, 698-701 [159 Cal.Rptr. 684, 602 P.2d 384] [People may raise error to support judgment attacked by an appealing defendant], judg. vacated and cause remanded (1980) 446 U.S. 932 [64 L.Ed.2d 784, 100 S.Ct. 2147], reiterated (1980) 28 Cal.3d 86 [168 Cal.Rptr. 603, 618 P.2d 149], cert. den. (1981) 451 U.S. 1021 [69 L.Ed.2d 395, 101 S.Ct. 3015].) The presumption of regularity applies to her claims as well as the People's. Here, while Woods does allude to error by the magistrate in an apparent effort to defend the superior court judgment, neither she nor our colleague succeeds in overcoming the presumption that the magistrate acted properly.

██ The magistrate in oral comments first acknowledged that the refiling was "permitted if either of the previous two dismissals were based solely on excusable neglect." He then said: "There is clearly neglect by the People by a number of attorneys, experienced attorneys, and by what appears

---

[6]Judge Moelk would later agree: "I quite frankly feel that the statements [Ms. Voss] made to Judge Harrison that the defense wasn't prepared to go on the Madison homicide, [are] not substantiated by the evidence."

according to the testimony to be a competent staff. I guess the question before me is, shall I excuse this admittedly negligent conduct." He clearly understood the need to find excusable neglect.

The magistrate then went on to discuss prejudice. He called prejudice "the primary factor." Our colleague apparently takes "primary" to mean the *most important* factor (Webster's Third New Internat. Dict. (1965) p. 1800), and notes that prejudice is not strictly relevant to whether neglect is excusable. However, "primary" also commonly means "first in order of time or development: Initial" (*ibid.*, first listed definition), a logical meaning to give the word in these circumstances, and prejudice was a separately valid factor under the statute. The magistrate next discussed lack of bad faith by the prosecutor, another statutory factor. He closed by saying: "In my opinion, human error or poor workmanship by the People, which is clearly present, was not intended by the Legislature to prohibit a trial on the merits. I think there should be a trial on the merits, right or wrong the second dismissal in this case *was a result of excusable neglect* within the meaning of Penal Code Section 1387.1. . . ." (Italics added.)

At most, the record shows some blurring of the ideas of excuse and prejudice, although one can just as easily infer from the magistrate's initial parsing of the statute's elements that he afterward used "excusable neglect" as a shorthand phrase for the statute as a whole. The record definitely does not show that the court somehow disregarded whether the People's neglect was excusable. The presumption of regularity stands unrebutted.

The dissent also finds comfort in several Court of Appeal decisions, most cited by Woods, where somewhat analogous facts have resulted in denials of relief under other statutes. However, no two cases in this area pose identical facts, and no one would dare argue that all "excusable neglect" cases can be neatly placed along a continuum and reconciled in result. Part of the reason lies in the concept of discretion. Quite similar facts might result in one trier of fact granting relief and another denying it, yet each ruling might be upheld. (*Ross* v. *Ross* (1941) 48 Cal.App.2d 72, 76 [119 P.2d 444] ["there are cases in which an order either way will be sustained on the ground that no abuse of discretion appears"].) ▪ Appellate review thus respects this sometimes divergent exercise of discretion. The abuse-of-discretion standard requires us to uphold a ruling which a reasonable judge might have made, even though we would not have ruled the same and a contrary ruling would also be sustainable. We cannot substitute our own judgment. (*Shamblin* v. *Brattain* (1988) 44 Cal.3d 474, 478-479 [243 Cal.Rptr. 902, 749 P.2d 339]; see 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 275, p. 286; 8 Witkin, *supra*, Attack on Judgment in Trial Court, §§ 180-183, pp. 582-585.)

In that light, we note that some cases relied on by our dissenting colleague are decisions upholding a discretionary *denial* of relief. (*Bellm* v. *Bellia* (1984) 150 Cal.App.3d 1036, 1038 [198 Cal.Rptr. 389]; *Ross* v. *Ross, supra,* 48 Cal.App.2d 72, 75-76; cf. *Davis* v. *Thayer* (1980) 113 Cal.App.3d 892 [170 Cal.Rptr. 328] [denial upheld on ground of inexcusable neglect not reached by trial court].) The others are distinguishable factually.

■ Finally, we are propelled in this case by the strong policy favoring affirmance of rulings granting relief. "[V]ery slight evidence is required to justify a trial court's order setting aside a default. [Citation.]" (*Shamblin* v. *Brattain, supra,* 44 Cal.3d 474, 478.)

No abuse of discretion appears in the magistrate's ruling granting relief. Judge Moelk erred in concluding otherwise. His order of dismissal must be reversed.

## III

■ The Benavidez count was properly charged in the second complaint and information. Woods contends that it must remain dismissed now because the People chose dismissal as a "tactical" matter to preserve the multiple-murder special circumstance allegation (§ 190.2, subd. (a)(3)), not due to excusable neglect on the Madison count. The People's options, she urges, were to seek writ review of the ruling denying leave to amend or to proceed on the one count only and, if successful in that trial and in efforts to file the Madison count a third time (§ 1387.1), charge the Benavidez count as a prior-murder-conviction special circumstance (§ 190.2, subd. (a)(2); *People* v. *Hendricks* (1987) 43 Cal.3d 584, 595-596 [238 Cal.Rptr. 66, 737 P.2d 1350] [order of commission of the homicides is immaterial]), thereby preserving the greater penalty option.

The People respond that both counts were tied to excusable neglect in the Madison count. The Madison count defect was discovered on the morning of the last day for trial in a no-time-waiver case; the court that afternoon refused to allow an amendment; and Woods thereupon insisted on not waiving time. The People argue that this forced them to dismiss *both* counts. Otherwise, they risked losing the ability to ever try the Madison count or to gain the special circumstance penalty of life without the possibility of parole (death not being sought). They urge that the prosecutor could not, as a practical matter, simultaneously proceed with trial and seek writ review of the leave-to-amend denial. Further, if a prior-murder-conviction special circumstance in a later trial of the Madison count was one way to preserve greater penalty, there were other obstacles. Because both murders were

committed at the same time and place, a prosecutor could reasonably fear that state-law policy against successive prosecutions of closely related crimes (*Kellett* v. *Superior Court* (1966) 63 Cal.2d 822, 824-827 [48 Cal.Rptr. 366, 409 P.2d 206]) would bar separate trials and that an acquittal on the Benavidez count might bar later prosecution of the other under federal-law principles of double jeopardy (*Ashe* v. *Swenson* (1970) 397 U.S. 436, 445-446 [25 L.Ed.2d 469, 476, 90 S.Ct. 1189]).

The parties agree that "excusable neglect" under section 1387.1 must be separately considered as to each count sought to be refiled. Whether prosecution is barred under the two-dismissal rule of section 1387 has long been separately considered as to each count of an action. "The section applies to bar the inclusion of counts of an information as well as to bar an entire information. [Citations.]" (*Dunn* v. *Superior Court* (1984) 159 Cal.App.3d 1110, 1114 [206 Cal.Rptr. 242].) The Legislature was presumptively aware of that judicial interpretation (*Harris* v. *Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1155-1156 [278 Cal.Rptr. 614, 805 P.2d 873]) when, in 1987, it introduced the exception in section 1387.1. We thus may assume that the same construction was intended as to the exception, a conclusion consistent with the language of the section. It speaks twice of refiling "charges." (§ 1387.1, subd. (a); fn. 5, *ante*.) We conclude that separate scrutiny of each twice dismissed count is required in deciding whether its third filing is justified by excusable neglect. (Cf. *Tapp* v. *Superior Court*, *supra*, 216 Cal.App.3d 1030, 1037-1038.)

We also hold that excusable neglect directly affecting one count may in some circumstances so affect another count that the People's decision to voluntarily dismiss that other count justifies a third filing of both. Woods disputes that general premise, but the law supports it. Subdivision (a) of section 1387.1 asks whether a prior dismissal was "due solely to excusable neglect." That requires causation between neglect and the dismissal. Where the dismissal involves more than one violent felony, it may be appropriate to ask further whether an entire dismissal, or only part of it, was "due solely to excusable neglect." (§ 1387.1, subd. (a).) We cannot categorically rule out the possibility that a dismissal of one defective count may so seriously impede the prosecution of a good count that a dismissal and refiling of both is justified.

Turning to our facts, we must reject the asserted concern about double-jeopardy or successive-prosecution bars to prosecuting the Madison count separately. Those concerns were never articulated in testimony or argument below. Highsmith stated that the dismissal decision, made by a supervisor in

his office after mutual discussion, was due to concern that the multiple-murder special circumstance would be lost if the counts were tried separately.[7] No other reason was given, and neither court below had occasion to consider other reasons. We reject the People's argument that Highsmith's mention of an inability to "ever get the punishment or penalty" (fn. 7, *ante*) impliedly conveyed concerns beyond the one which he articulated. A court examining excusable neglect has no occasion to consider the objective reasonableness of states of mind not subjectively held. (Cf. *Elston* v. *City of Turlock, supra,* 38 Cal.3d 227, 234-235.)

That leaves the multiple-murder concern. On these facts, we conclude that it supported allowing both counts to be refiled. The charged multiple-murder allegation was unavailable in a separate trial (§ 190.2, subd. (a)(3) [the defendant has "in this proceeding been convicted of more than one" first or second degree murder]), and Woods refused to waive time on the last day for trial to begin. This forced the People to either proceed separately with the Benavidez count and forfeit the multiple-murder allegation, or dismiss and try to refile both counts together.

Section 1387.1, subdivision (a), allows the People an additional chance to "refile charges" where a prior dismissal of a violent felony "offense" was due solely to excusable neglect. A multiple-murder special circumstance is not an offense itself but a special allegation attached to the violent felony offense of murder. Still, section 1387.1 allows a refiling of "charges" and has been construed to include special allegations attached to an offense. (See, e.g., *Tapp* v. *Superior Court, supra,* 216 Cal.App.3d 1030, 1037.) Some offenses become violent felonies *only* when special allegations are alleged and proved. (§ 667.5, subds. (c)(8) [any felony with great bodily injury or firearm use] and (c)(9) [robbery with personal use of a deadly or dangerous weapon].) Section 1387.1 thus envisions that a finding of excusable neglect preserves special allegations attending the offense even though, as in a case like ours, there was no defect in those allegations.

A multiple-murder special-circumstance allegation is unique. Unlike any other, it minimally requires *two* counts of murder in the same proceeding. Woods would have us hold that excusable neglect directly affecting the dismissal of only one such count never allows a refiling of the other.

[7]Highsmith testified in municipal court that he had been prepared to go ahead with one count. However, "if we proceeded as to Benavidez we would never have a multiple murder, special circumstances, because [section 190.2, subdivision (a)(3)] requires that the multiple murder[s] be in the same proceedings and that meant . . . that we could not ever get the punishment or penalty that we would have gotten had we gotten both victims." He repeated that concern in argument to the superior court, never mentioning double jeopardy or successive prosecution.

However, this would construe section 1387.1 in a way that leaves the People no way to save a multiple-murder case when an 11th-hour problem arises, as to just 1 count, under the constraints of a no-time-waiver trial. It would mark a departure from the usual consequence of finding excusable neglect, which is to resurrect any attendant special allegations. The Legislature could not have intended such rigidity. Section 1387.1 is a remedial tool designed to save serious-felony prosecutions from improvident loss. We construe it as preserving multiple-murder allegations attached to counts dismissed due to excusable neglect, and thus as preserving, in exceptional circumstances, another dismissed murder count essential to the multiple-murder allegation.

We hold that the refiling of both murder counts in this case was justified. The prosecutor had to make a decision on the last day for trial, after the defense refused to waive time, and he correctly saw that to proceed on just one count meant forfeiting the special circumstance allegation. His dismissal of both counts, on these facts, allowed their refiling on a finding of excusable neglect under section 1387.1.

Even if we could accept Woods's contrary view of the statute's scope, we would have to uphold the ruling based on excusable neglect or error in the prosecutor's own construction of it. No case had yet addressed this issue, and a reasonable attorney saddled with the extraordinary facts in this case could have believed, and was impliedly found to have believed, that the statute would allow the refiling of both counts.

Woods proposes two alternate "remedies" short of double dismissal, but neither one is convincing. ■ We do not agree, first, that the People can be held inexcusably negligent as a matter of law for not seeking writ relief against the trial judge's denial of leave to amend. To do so during trial on the Benavidez count was impractical and posed a tremendous gamble. Success in joining the Madison count in the ongoing proceedings depended not only on obtaining extraordinary relief but, as a practical matter, securing a stay from this court pending the writ application. Competent counsel could reasonably believe that securing pretrial relief from a discretionary ruling, like the leave-to-amend denial here, was a dangerous strategy.

Moreover, the idea that the People must always exhaust alternative remedies of this sort has been rejected. In *Tapp* v. *Superior Court, supra,* 216 Cal.App.3d 1030, the People had secured a continuance which the defendant successfully attacked by writ, the Court of Appeal overturning the order because of deficient supporting papers. Nevertheless, the court later held those deficiencies to be excusable neglect under section 1387.1 and rejected the defendant's claim that the cause for a later dismissal was the People's

failure to make a renewed continuance motion right after the writ reversal. (216 Cal.App.3d at pp. 1036-1037.) Failure to renew was held excusable: the defense had insisted it was already too late to begin the trial, and the prosecutor, who believed she still had one day left, was unprepared because a necessary witness was unavailable. (*Id.*, at pp. 1033, 1037.) Thus, "[t]he dismissal might have been avoided but it came about solely due to excusable neglect." (*Id.*, at p. 1037.) Likewise, the People here might have avoided a dismissal of the Benavidez count. However, to proceed with trial while seeking writ relief from the leave-to-amend ruling was reasonably rejected as an impractical and risky alternative. Any neglect was excusable.

We also find excusable any neglect in the prosecutor not opting to go ahead with the Benavidez count and use a prior-murder-conviction special circumstance (§ 190.2, subd. (a)(2)) in any later, separate trial on the Madison count. While that in hindsight may have been a viable way to proceed (*People* v. *Johnson* (1991) 233 Cal.App.3d 425, 448-449 [284 Cal.Rptr. 579] [due process was not violated by adding a prior-murder-conviction amendment after a verdict in another case]), it is telling that no one apparently thought of it until this appeal. The judge who found excusable neglect below did not have the benefit of testimony or argument on the issue. We cannot fault the prosecutor for not divining the solution. Any neglect in that regard was excusable.

We uphold the refiling of both counts.

## IV

Woods filed a petition for writ of habeas corpus in this court (A055860) soon after the dismissal. She sought a release from custody, noting that no charges existed against her and disputing Judge Moelk's ruling at the time of dismissal that she would remain in custody pending the People's promised appeal. She invoked section 1242: "An appeal taken by the people in no case stays or affects the operation of a judgment in favor of the defendant, until judgment is reversed." After receiving informal opposition, we ordered a show cause hearing in superior court. Judge Moelk heard the matter and denied the petition, holding that custody was legal, at least once the People filed their notice of appeal.

Woods then filed a "supplemental" petition in this court (A056503), relying on the record created in the first writ proceeding and repeating her legal argument. Treating it as a new application, we ordered a show cause hearing in this court and expedited the briefing in both cases so that they could be heard together.

Having found on the appeal that the dismissal was in error, the habeas corpus petition is moot. Woods's custody is legal now that we reverse the judgment of dismissal (§ 1242).

### DISPOSITION

On the appeal, the order dismissing the information is reversed. On the petition for writ of habeas corpus, the order to show cause is discharged, and the petition is denied as moot.

Benson, J., concurred.

**KLINE, P. J.,** Dissenting.—Rarely is the neglect of counsel as manifestly inexcusable as the repeated failures of the district attorney in this case. In my view, the continuing failure of prosecutors to correct glaring defects in charging documents in a homicide case after these defects were repeatedly called to their attention constitutes gross negligence.

### I.

The majority's labored attempt to find some justification for deferring to the ruling of the magistrate rather than the conflicting ruling of the superior court reflects, among other things, the majority's belief that the magistrate addressed the central issue in this case; namely, whether the prosecutorial negligence in question "might have been the act of a reasonably prudent person under the same or similar circumstances" (*Ebersol* v. *Cowan* (1983) 35 Cal.3d 427, 435 [197 Cal.Rptr. 601, 673 P.2d 271]; *Tammen* v. *County of San Diego* (1967) 66 Cal.2d 468, 476 [58 Cal.Rptr. 249, 426 P.2d 753]; *Baratti* v. *Baratti* (1952) 109 Cal.App.2d 917, 921 [242 P.2d 22]), which the parties agree is the definition of "excusable neglect." My colleagues' deference to the magistrate is not only meaningless, because he made no such finding, but improper, because the different finding the magistrate did make was untenable as a matter of law.

The magistrate's conclusion that the district attorney's neglect was excusable was based *solely* on the absence of prejudice to the defendant if the third filing was permitted. Explaining his conclusion that the neglect was excusable, the magistrate stated as follows: "In considering whether or not the neglect in this case is excused, *the primary factor I'm looking at is whether or not this defendant is prejudiced by the way this case has been handled.*[1] Any defendant is prejudiced by being charged with a crime, being incarcerated,

---

[1] Relying on the fact that one of the dictionary definitions of "primary" is "first in order of time," the majority suggests the magistrate eventually addressed the question whether the

held without bail or a high bail. Now, in this case is the defendant prejudiced by the third filing? What is the effect on this defendant? A review of the record shows that there was no surprise in the Superior Court, in my opinion, based on my review of all the records, and if the third refiling is allowed she will be facing, once more, the charges she already knew about and decided to ignore in Superior Court." (Italics added.)

After reiterating that the district attorney was "not playing games or vindictive" and therefore not guilty of bad faith,[2] the magistrate concluded his explanation of why the negligence was excusable with the following observation: "In my opinion the repeated filings by the People do not amount to a denial of any right of a constitutional magnitude. Specifically, there doesn't appear to be any due process violation and no due process violation is alleged by the defense. No speedy trial violation is alleged or shown, so in my opinion the previous dismissals are neither vindictive [n]or malicious. *In short, the refiling of the charges of which the defendant was already aware and prepared to defend inflicts no prejudice on her.*" (Italics added.)

The magistrate's analysis eviscerates Penal Code section 1387.1.[3]

Obviously, if denial of a constitutional right or violation of the speedy trial statutes (§§ 686, 1381 et seq.) were necessary to make out a violation of section 1387.1, section 1387.1 would be completely unnecessary.

Section 1387.1 would also be meaningless if enforcement of the duty it imposes and the right it confers required a showing that the defendant would otherwise be prejudiced. Our Supreme Court has consistently repudiated the idea that the absence of prejudice can alone constitute a sufficient basis for setting aside an otherwise unexcused default. Thus, in *Carroll* v. *Abbott Laboratories, Inc.* (1982) 32 Cal.3d 892 [187 Cal.Rptr. 592, 654 P.2d 775], one of the seminal cases defining the concept of excusable neglect, the court rejected the use of prejudice as a dispositive consideration, stating there is "no case which permits the setting aside of a judgment in spite of inexcusable neglect, simply because the other side has not been prejudiced." (*Id.*, at p. 900, citing generally, *In re Marriage of Park* (1980) 27 Cal.3d 337, 345 [165 Cal.Rptr. 792, 612 P.2d 882]; *Weitz* v. *Yankosky* (1966) 63 Cal.2d 849, 857 [48 Cal.Rptr. 620, 409 P.2d 700]; *Benjamin* v. *Dalmo Mfg. Co.* (1948) 31

prosecutors' negligence might have been objectively reasonable. (Maj. opn., *ante*, at p. 1153.) The best refutation of this suggestion is the magistrate's own explanation for his ruling, which is set forth in its entirety in the appendix to this dissent.

[2] Defendant never claimed the district attorney's negligence reflected bad faith and does not here challenge the finding of no bad faith.

[3] All statutory references are to the Penal Code unless otherwise indicated.

Cal.2d 523, 531-532 [190 P.2d 593].) The governing principle was neatly summed up recently in *Iott* v. *Franklin* (1988) 206 Cal.App.3d 521 [253 Cal.Rptr. 635]: "Whether or not the conduct of respondents' attorney prejudiced appellant is irrelevant. If the conduct was excusable, prejudice to appellant will not make it inexcusable. But if the conduct was inexcusable, absence of prejudice to appellant will not make it excusable. [Citations.]" (*Id.*, at p. 531.)

The majority says that this dissent rests on my "view that the magistrate erroneously failed to reach the question of excusable neglect," and says this argument is "easily rebutted." (Maj. opn., *ante*, p. 1152.) The argument is indeed easily rebutted, but it is not my argument. The majority's procrustean effort to minimize the magistrate's improper reliance on prejudice is accomplished not only by distorting the magistrate's explanation for his ruling, but by mischaracterizing the issue. The question in this case is not, as the majority claims, whether the magistrate "understood the need to find excusable neglect." (Maj. opn., *ante*, at p. 1153.) Of course he did. The question in this case is whether the magistrate understood and applied the legal definition of excusable neglect; that is, whether the magistrate actually determined that the undisputed prosecutorial neglect "might have been the act or omission of a reasonably prudent person under the same or similar circumstances." (*Ebersol* v. *Cowan, supra*, 35 Cal.3d 427, 435.) The magistrate's explanation for his finding that the neglect was excusable reveals his complete ignorance of or indifference to the legal standard and shows that he ruled as he did only because he believed respondent would not be prejudiced if a third filing of the criminal complaint was permitted.

The statement in *Elston* v. *City of Turlock* (1985) 38 Cal.3d 227, 235 [211 Cal.Rptr. 416, 695 P.2d 713], seized upon by the majority ("Reversal is particularly appropriate where relieving the default will not seriously prejudice the opposing party"), is not at all inconsistent with the settled principle that the absence of prejudice cannot excuse conduct otherwise inexcusable. The problem in this case is not that in reaching his decision the magistrate considered the lack of prejudice. The problem is that that is all he considered.

It is, of course, true that the district attorney's application for relief was addressed to the sound discretion of the trial judge. "That discretion, however, ' "is not a capricious or arbitrary discretion, but an impartial discretion, guided and *controlled in its exercise by fixed legal principles*." ' " (*Carroll* v. *Abbott Laboratories, Inc., supra*, 32 Cal.3d 892, 898, quoting *Benjamin* v. *Dalmo Mfg. Co., supra*, 31 Cal.2d at p. 526, italics added.) An exercise of discretion that conflicts with such principles exceeds the authority of the

court and is not entitled to the indulgence of an appellate court. Decisions reversing trial court orders granting relief are not uncommon even in cases in which the trial court ruling conforms to the applicable legal principles. (*Iott v. Franklin, supra,* 206 Cal.App.3d 521, 529; see also *Gardner* v. *Superior Court* (1986) 182 Cal.App.3d 335, 339 [227 Cal.Rptr. 78]; *Martin* v. *Cook* (1977) 68 Cal.App.3d 799 [137 Cal.Rptr. 434].) Reversal is all the more warranted where, as here, there is no material factual dispute[4] and the lower court applies a legally erroneous test.

Superior Court Judge James Moelk, whose familiarity with the relevant evidence was equal to that of the magistrate, recognized the magistrate's legal error. As he stated, "[t]he Magistrate really did not analyze his findings factually and simply made the statement that he found excusable neglect and then went on to talk about prejudice . . . ."[5] The magistrate's complete reliance on the lack of prejudice to defendant implies he was unable to find any other excuse for the repeated carelessness of counsel. In any case, the best that can be said of the magistrate's action is that he ignored the central question whether the district attorney's errors "might have been the act of a reasonably prudent person under the same or similar circumstances." (*Ebersol* v. *Cowan, supra,* 35 Cal.3d at p. 435.) Superior Court Judge Moelk, on the other hand, made the appropriate inquiry and expressly found that the negligence in question was not objectively reasonable and was therefore inexcusable within the meaning of the statute. It seems to me strange indeed to prefer a factual finding that was never made to one that was.

II.

The majority attempts to finesse the magistrate's error by wrapping his ruling in something called "the presumption of regularity" and by placing upon respondent the "burden to overcome the regularity presumption by an affirmative showing." (Maj. opn., *ante,* at p. 1152.) The majority thus sets up its conclusion that, though respondent "does allude to error by the magistrate," she has failed to overcome her burden of "overcoming the presumption that the magistrate acted properly." (Maj. opn., *ante,* at p. 1152.) This

---

[4]Thus appellate courts have suggested that a trial court ruling that resolves conflicts in the evidence is entitled to greater deference from a reviewing court than a trial court ruling in a case, such as this one, in which there is no conflict in the evidence. (See, e.g., *Iott v. Franklin, supra,* 206 Cal.App.3d 521, 530.)

[5]Judge Moelk also noted the magistrate's apparent feeling that defense counsel had a duty to bring the defect in the charging documents to the attention of the district attorney. As Judge Moelk stated, "the defense has no obligation whatsoever to do anything to assist the prosecutor. That is not the defense's responsibility." (See *Bellm* v. *Bellia* (1984) 150 Cal.App.3d 1036, 1038 [198 Cal.Rptr. 389] [failure to give opposing counsel notice of default may be unprofessional but is not a duty and provides no ground for relief under Code Civ. Proc. § 473].) In any event, considering the number of *judges* whose repeated admonitions were consistently ignored, it is hard to imagine the prosecution would have paid any attention to the advice of defense counsel.

argument, which was never advanced by the People, turns this case on its head.

First of all, the "presumption of regularity" the majority uses to validate the magistrate's ruling, and which is the cornerstone of its opinion, is wholly unwarranted. The cases the majority rely upon, which relate to the presumption of official duty regularly performed codified in Evidence Code section 664, state that a reviewing court may presume that the trial court followed established law *only in the absence of any contrary evidence. (Ross* v. *Superior Court* (1977) 19 Cal.3d 899, 913 [141 Cal.Rptr. 133, 569 P.2d 727] and cases there cited; *People* v. *Mack* (1986) 178 Cal.App.3d 1026, 1032 [224 Cal.Rptr. 208].) There is in this case abundant evidence that the magistrate applied an erroneous legal standard, as well as recognition of this error by the superior court. The idea that such evidence of legal error can be whitewashed and the order of the superior court ignored on the basis of a presumption that a magistrate acted properly is simply astonishing.

It deserves to be noted, in this connection, that in the absence of a statute specifying the magistrate as the fact finder, such as section 995, or making the magistrate's findings "binding" on the superior court, such as section 1538.5, subdivision (i), a magistrate's findings as to credibility and the weight of the evidence are not entitled to the special deference of a reviewing court and there *is* a right to a de novo hearing in the superior court. (*People* v. *McCoy* (1983) 147 Cal.App.3d 638 [195 Cal.Rptr. 285].) That is why the standard of review in this case is not, as the majority claims, analogous to the review of a motion to set aside an information under section 995 or to suppress evidence presented on a prior motion before a magistrate under section 1538.5. "Judges of the municipal court acting in the capacity of magistrates do not have the jurisdiction and powers pertaining to their judicial offices." (*In re Geer* (1980) 108 Cal.App.3d 1002, 1006 [166 Cal.Rptr. 912], citing *People* v. *Crespi* (1896) 115 Cal. 50, 54 [46 P. 863].) Therefore, as stated in *People* v. *McCoy, supra,* 147 Cal.App.3d 638, a magistrate's decision "that there was no such delay as would require dismissal can reach no further than his limited jurisdiction and is not binding on the superior court, which, as the trial court, has jurisdiction over the ultimate questions of guilt and innocence." (*Id.,* at p. 642.) Appellant's argument that the magistrate is undeserving of deference because it lacks the jurisdiction of a "trial court" is therefore neither "fatuous" nor "a word game." (Maj. opn., *ante,* at p. 1148.)

In any event, unaware of the "presumption of regularity" concocted by the majority, the Attorney General recognizes that the burden of persuasion in this case does not lie with respondent, but that it is the *People's* burden to

persuade this court "that the superior court erred in granting the motion to dismiss."

## III.

The magistrate's finding would not be entitled to the deference of a reviewing court even if it was entitled to greater deference than that of the superior court and even if it had been made on a legally correct basis, because it is factually insuppportable.

As respondent points out, every single member of the district attorney's office connected with this case failed to properly discharge an important responsibility. Deputies Coffer and Highsmith failed to read important documents signed under penalty of perjury; three legal assistants or secretaries failed to correct the charging papers when instructed to do so; Deputies Coffer and Sherrer failed to correct obvious defects in the documents after these defects were called to their attention on two different occasions by two different judges; and Deputy Highsmith failed to read the charging document at the time trial was ready to commence. These are not the mistakes of reasonably prudent persons even if each is considered separately[6] and even ignoring the repeated admonitions of the judges who called the defects in the charging documents to the attention of counsel.

The failure to read an important document has been held inexcusable in circumstances considerably more sympathetic than those in this case. In *Davis* v. *Thayer* (1980) 113 Cal.App.3d 892 [170 Cal.Rptr. 328], the complaint for restitution and damages alleged that plaintiff was entitled to punitive damages in the sum of $50,000 because defendants had acted with oppression, fraud and malice. When neither defendant appeared, defaults were entered as to each of them. Defendants' motion to set aside their defaults was denied on the sole ground that the motion exceeded by one day the six-month limit authorized under section 473 of the Code of Civil Procedure. Affirming, the Court of Appeal stated as follows: "If [counsel] failed to read the complaint he was guilty of gross negligence. If he did read it and disregarded its allegations he was guilty of careless and indifferent conduct. In either event relief should be denied." (113 Cal.App.3d at p. 906.)

---

[6]The deputy district attorneys in this case are all agents of the District Attorney of Solano County. Section 739 provides that "it shall be the duty of the district attorney of the county in which the offense is triable to file in the superior court of that county within 15 days after the commitment, an information against the defendant which may charge the defendant with either the offense or offenses named in the order of commitment or any offense or offenses shown by the evidence taken before the magistrate to have been committed. The information shall be in the name of the people of the State of California and subscribed by the district attorney." This statute suggests that the duty imposed upon the district attorney cannot be divided between and among his deputies and separately evaluated. In the final analysis the district attorney must bear the indivisible responsibility for the acts of his agents.

*Ross* v. *Ross* (1941) 48 Cal.App.2d 72 [119 P.2d 444] is factually similar to the present case in several important respects. In that divorce action the plaintiff wife, whose previous action had been dismissed a few days earlier, filed a claim for temporary alimony and for an allowance of counsel fees and costs; the papers advancing this claim and an order to show cause were bound together with the complaint in a single volume. The defendant never examined the papers but simply took them to the office of his attorney in Modesto. That attorney did not inspect the papers; he simply prepared a motion for a change of venue and forwarded the papers to a firm of attorneys in Los Angeles, with a letter informing them that "copy of the summons and the complaint" was enclosed. (*Id.*, at pp. 74-75.) "On reaching Los Angeles this letter was opened by the secretary of the Los Angeles attorneys, who read the letter but not the enclosed papers. She handed the letter and papers to one of the firm, stating that they contained 'complaint and motion for change of venue.' This attorney read the letter but did not discover the order to show cause, and he handed the file to another attorney in the firm and told him the case involved a motion for a change of venue exactly like the one in the previous case and asked him to attend to it. Apparently the second attorney also did not read the papers, for he 'did not learn that an order to show cause had been ordered and was heard on August 8, 1939, until August 10, 1939, when he was informed by attorney for plaintiff.' " (*Id.*, at p. 75.)

The trial court denied the defendant's motion to vacate and the Court of Appeal affirmed, pointing out that "the defendant himself, three attorneys to whom the care of his interests in this action was committed and one legal secretary unanimously failed to read all the papers served on him or even to ascertain what papers were served, although they all had those papers in their hands with ample opportunity, as far as appears, for examination. Such a failure to examine the papers served on defendant undoubtedly constituted a neglect of duty. [Citations.]" (48 Cal.App.2d at pp. 75-76.)

In *Ross* opposing counsel helped cause the problem by the unusual practice of binding the claim for temporary alimony, fees and costs and the order to show cause together with the complaint under a single cover. The negligence in the present case was not induced by any affirmative act of opposing counsel. More importantly, the negligence in *Ross* was not repeatedly called to counsels' attention by any third parties, let alone by judicial officers.

*Martin* v. *Cook, supra,* 68 Cal.App.3d 799 also exemplifies the seriousness courts have heretofore attached to the failure of counsel to read important documents. In that case plaintiff's counsel failed to read a stipulation in which the defendant waived the two-year statute of limitations and, as a

result, erroneously assumed the five-year statute had been waived. The court reversed the granting of relief by the trial court even though the plaintiff had been awarded a $100,000 verdict. Similarly, in *Penryn Land Co.* v. *Akahori* (1918) 37 Cal.App. 14 [173 P. 612] the neglect of an estate administrator to carefully read the summons served upon him was held inexcusable and insufficient to invoke relief under Code of Civil Procedure section 473.

The cases relied upon by the majority are readily distinguishable. The majority cites *Bettencourt* v. *Los Rios Community College Dist.* (1986) 42 Cal.3d 270 [228 Cal.Rptr. 190, 721 P.2d 71] for the proposition "that [Deputy District Attorney] Highsmith's overall performance in this case was diligent, which bears on whether his single area of neglect here was excusable." (Maj. opn., *ante*, at p. 1151.) *Bettencourt* turns more on the reasonableness of counsel's mistake than his diligence in correcting it. The plaintiffs in *Bettencourt* brought an action for the wrongful death of their son on a city college field trip. Plaintiffs' counsel, believing the college's employees worked for the state, filed a claim with the state, and did not discover his mistake until expiration of the statutory period for filing a claim. In concluding that the mistake was objectively reasonable the Supreme Court emphasized that the facts were confusing and the law obscure. "Counsel practiced law in Walnut Creek, which is approximately 75 miles from Sacramento. He has never lived in Sacramento County, nor has he practiced law there. He was not familiar with the Los Rios Community College District or Sacramento City College. Moreover, public higher education in California represents a sometimes confusing blend of state and local control and funding. For example, the Los Rios Community College District, like all community college districts, is overseen by the state Community College Board of Governors, whose members are appointed by the Governor. [Citation.] Accordingly, it would not have been unreasonable for counsel to assume that Sacramento City College was part of the statewide higher education system." (42 Cal.3d at pp. 276-277.)

Deputy District Attorney Highsmith's negligence in this case, like that of his colleagues, bears no resemblance whatsoever to the understandable error of counsel in *Bettencourt*. Highsmith is among the most experienced prosecutors in Solano County, authorized to try the most serious of all felony cases. It would be utterly preposterous to believe he was unaware of the basic requirements of a criminal complaint or information or the duty to read a document filed by his office, and signed under penalty of perjury, purporting to charge a double homicide. Moreover, Highsmith was intimately familiar with the facts of defendant's case, as he had recently completed prosecution of her alleged crime partner with respect to the same homicides. Furthermore, unlike counsel in *Bettencourt*, who diligently discovered the

mistake himself, Deputy Highsmith and his colleagues did not discover their own errors and even failed to correct them after the errors were called to their attention. Finally, relief was granted in *Bettencourt* under Government Code section 946.6, which unlike section 1387.1, "is a remedial statute intended 'to provide relief from technical rules that otherwise provide a trap for the unwary claimant.' [Citations.] As such, it is construed in favor of relief whenever possible. [Citation.]" (*Bettencourt, supra,* (42 Cal.3d at p. 275.) No such indulgence attends the application either of section 1387.1 or Code of Civil Procedure section 473.

*Elston* v. *City of Turlock, supra,* 38 Cal.3d 227, also relied upon by the majority, is also easily distinguishable. The attorney there failed to answer a request for admissions concerning the ultimate issues of the case, which were therefore deemed admitted. Not only was the error never called to counsel's attention, as it was in the present case, but the attorney was understandably "unaware of his duty to appear or answer because his employees misplaced papers or misinformed him as to the relevant date . . . ." (*Id.,* at p. 234.) The attorney in *Elston* did "not allege that he was aware of the request for admissions and nevertheless failed to answer because he forgot or was too busy." (*Ibid.*) Counsel's negligence in the present case is far more egregious. None of the deputy district attorneys who failed to read the charging documents claimed they were unaware of the duty to do so or that, if they had fully read the document, they would not have perceived the defect. Moreover, their "excuses" are precisely those which *Elston* indicates are unacceptable, that they forgot or were just too busy. As Deputy Highsmith put it, he "shot from the hip alot [*sic*]" due to his workload.

The test in this case, it bears reiterating, is not whether counsel can explain his or her negligence, because that can usually be done.[7] The test is an objective one: whether the neglect, mistake or inadvertence "might have been the act of a reasonably prudent person under the same circumstances." (*Ebersol* v. *Cowan, supra,* 35 Cal.3d at p. 435; *Tammen* v. *County of San Diego, supra,* 66 Cal.2d at p. 476; *Baratti* v. *Baratti, supra,* 109 Cal.App.2d at p. 921.) To conclude, as do my colleagues, that a reasonably prudent district attorney prosecuting a double homicide need not read the charging document signed under penalty of perjury and correct defects therein, even when the defects were repeatedly called to his or her attention by judicial officers, demeans the professionalism of the district attorneys of this state, condones irresponsibility (*Gardner* v. *Superior Court, supra,* 182 Cal.App.3d

---

[7]Thus, for example, in *Bellm* v. *Bellia, supra,* 150 Cal.App.3d 1036, the court found it understandable but legally irrelevant that the defendant's failure to file a timely answer was occasioned by his distraction over the fact that his father was dying of cancer.

335, 339), undermines the orderly process of the law (*Transit Ads, Inc.* v. *Tanner Motor Livery, Ltd.* (1969) 270 Cal.App.2d 275, 282 [75 Cal.Rptr. 848]) and thwarts the policy reflected in section 1387.1. This should not be done. "Courts do not relieve litigants from the effects of mere carelessness." (*Benjamin* v. *Dalmo Mfg. Co., supra*, 31 Cal.2d 523, 529.)

## IV.

The question whether the neglect of counsel was excusable pertains only to the Madison count (count 1), as the prosecution was never negligent in connection with the Benavidez count (count 2). Although the Benavidez homicide was at all times correctly charged, the prosecutor twice dismissed it for tactical reasons, first because of the absence of an essential witness and subsequently because it was thought necessary in order to preserve the multiple-murder special-circumstance allegation after the superior court dismissed the Madison murder charge. Though defense counsel repeatedly pointed out that excusable neglect could not be used to permit a third filing of the Benavidez count, and the prosecution never disputed this assertion, the magistrate neglected to address the issue—apparently because of his erroneous preoccupation with the question of prejudice. The superior court did not address the issue because its dismissal of the entire information rendered it unnecessary to do so.

Holding that "excusable neglect directly affecting one count may in some circumstances so affect another count that the People's decision to voluntarily dismiss that other count justifies a third filing of both" (maj. opn., *ante*, at p. 1155), the majority concludes that dismissal of the defective Madison count so seriously impeded prosecution of the Benavidez count that the voluntary dismissal of the latter count was justifiable and a third refiling permissible. The majority's reasoning is unsound, will create uncertainty in the law, and does not, in any event, support the result the majority reaches.

### 1.

The idea that a charge may be refiled a third time even though both prior dismissals were deliberately made for tactical reasons rather than as a result of excusable neglect cannot be reconciled with the plain language of section 1387.1. In the words of the statute, a third refiling of a previously dismissed charge is permissible only where either of the prior dismissals of each dismissed charge "were due solely to excusable neglect." (§ 1387.1, subd. (a), italics added.) The majority concedes, as it must, that for purposes of section 1387.1, "excusable neglect" must be separately considered as to each of multiple counts sought to be refiled. (See *Dunn* v. *Superior Court* (1984) 159 Cal.App.3d 1110, 1118 [206 Cal.Rptr. 242].)

The majority is unwilling to conclude that section 1387.1 means what it says because such a construction would in this case "leave[] the People no way to save a multiple-murder case when an 11th-hour problem arises, as to just 1 count, under the constraints of a no-time-waiver trial." (Maj. opn., *ante*, at p. 1157.) According to the majority, "[t]he Legislature could not have intended such rigidity." (*Ibid.*) Putting aside for the moment the falsity of the assertion that the People had no way to save the multiple-murder allegations, the majority is saying that the Legislature could not have intended that section 1387.1 might have very adverse consequences for district attorneys. This is inconceivable. A statute declaring that a criminal charge may not be refiled a third time unless one of the prior dismissals was the result of excusable neglect obviously contemplates that the People may in some cases be prevented from charging not just special allegations but violent felony offenses. The risk the majority eliminates is inherent in the preclusion by section 11387.1 of third refilings of violent felony charges. There is no basis in the statute, the legislative history, the case law or in reason for the exception to the clear mandate of section 1387.1 which the majority carves out. Courts cannot create exceptions to rules of general application in the absence of an explicit legislative direction. (*Stockton Theatres, Inc.* v. *Palermo* (1956) 47 Cal.2d 469, 476 [304 P.2d 7].) "A court may not insert into a statute qualifying provisions not intended by the Legislature and may not rewrite a statute to conform to an assumed legislative intent not apparent. (*Bruce* v. *Gregory* (1967) 65 Cal.2d 666, 674 . . . .)" (*Burnsed* v. *State Bd. of Control* (1987) 189 Cal.App.3d 213, 217 [234 Cal.Rptr. 316]; 2A Sutherland, Statutory Construction (5th ed. 1992) § 47.11, p. 165.)

The majority's revision of the statute also creates an uncertainty bound to confound the trial courts, because it provides no guidance for identifying the circumstances in which excusable neglect as to one count may "so affect another count" as to permit a third refiling of such other count despite the absence, as to it, of excusable neglect. It is not useful to say that the refiling of the "good count" is justified where the prosecution of that count is "seriously impede[d]" by the dismissal of a "defective count" without providing some guidelines as to what constitutes a "serious impediment." The problem is exacerbated because in this case, as will be seen, no impediment genuinely exists. Confusion will also result from the majority's focus on the special allegations that attend felony charges in order to enhance sentence under section 667.5. (Maj. opn., *ante*, at pp. 1156-1157.) It is irrelevant that section 1387.1 "envisions that a finding of excusable neglect preserves special allegations attending the offense . . . ." (Maj. opn., *ante*, at p. 1156.) In order to preserve special allegations attending the offense in question there must first be a finding of excusable neglect as to

that offense. There was no such finding in this case, nor even a claim of excusable neglect, with respect to the twice dismissed Benavidez count. What the majority therefore seems to be suggesting is that a twice dismissed count can be refiled a third time without a finding of excusable neglect if that is essential to the proof of a special allegation attending the count as to which there was excusable neglect. There are several logical and legal problems with this reasoning, which has never been advanced by the People nor adopted by any court. Not the least of the problems is the false premise that dismissal of the Benavidez count was essential to the proof of the special allegations.

2.

The majority accepts the People's contention that the multiple-murder special circumstance would be lost if the prosecution proceeded to try the Benavidez count separately on the ground that "[a] multiple-murder special-circumstance allegation is unique. Unlike any other, it minimally requires *two* counts of murder in the same proceeding." (Maj. opn., *ante*, at p. 1156, italics in original.) This is untrue.

While "special circumstances" warranting death or confinement in state prison for life without possibility of parole may be alleged under subdivision (a)(3) of section 190.2 when "[t]he defendant has *in this proceeding* been convicted of more than one offense of murder in the first or second degree" (italics added), such "special circumstances" also may also be alleged, under subdivision (a)(2), when "[t]he defendant *was previously convicted* of murder in the first degree or second degree." (Italics added.) The case law also establishes that the severance of two previously joined murder charges cannot deprive the People of the right to allege special circumstances and seek imposition of one of the heightened penalties authorized under section 190.2. (*People* v. *Hendricks* (1987) 43 Cal.3d 584, 595-596 [238 Cal.Rptr. 66, 737 P.2d 1350]; *People* v. *Johnson* (1991) 233 Cal.App.3d 425, 449 [284 Cal.Rptr. 579].) Because separate trials would not impair the ability of the prosecution to prove a multiple-murder special circumstance, dismissal of the Madison count created no impediment, let alone a "serious impediment," to prosecution of the Benavidez count and there was no prosecutorial need to dismiss that count when the Madison count was dismissed.

The majority admits that separate trials on the two counts "may have been a viable way to proceed" (maj. opn., *ante*, at p. 1158), making it unnecessary to voluntarily dismiss the Benavidez count. My colleagues claim, however, that this possibility was not something a reasonably competent district attorney could have been expected to realize, finding it "telling that no one

apparently thought of it until this appeal." (Maj. opn., *ante,* p. 1158.) It is the prosecution, not the defendant, that has this responsibility. Given the clarity of the statutory authorization of multiple-murder special circumstances with respect to homicides that are separately prosecuted (§ 190.2, subd. (a)(2)), which is not hidden in some hard-to-find portion of the Penal Code, it did not require unusual intellect or experience to realize that the Benavidez count could be separately tried without any prejudice whatsoever to the special circumstance allegation. The feeble attempts of the Attorney General to persuade us otherwise are the best measure of the absence of any good reason to voluntarily dismiss the Benavidez count.[8]

The unfortunate effect of the majority opinion is to excuse inexcusable ignorance; it is a perverse irony that this is accomplished in connection with a statute calculated to hold prosecutors to a high standard of conduct.

I would affirm the judgment of the superior court and grant the petition for habeas corpus.

Respondent's petition for review by the Supreme Court was denied April 22, 1993. Mosk, J., was of the opinion that the petition should be granted.

---

[8]The Attorney General claims separate prosecutions would violate state policy "to require joinder of related offenses in a single prosecution." (*Kellett* v. *Superior Court* (1966) 63 Cal.2d 822, 826 [48 Cal.Rptr. 366, 409 P.2d 206], fn. omitted.) This salutary policy clearly would not bar separate trial of the Benavidez count, as dismissal of the Madison count would provide ample "good cause" for severance. (See *Kellett, supra,* at p. 827.) The other justification the Attorney General offers for the failure to proceed separately is that "under federal law the prosecutor might have been unable to try the Madison count and special circumstance if defendant were first acquitted on the Benavidez count." Acquittal on the Benavidez count could, of course, also occur if it were tried in the same proceeding as the Madison count, in which case the special circumstance allegation would also fail.

APPENDIX

"THE COURT: Okay. Is the matter submitted?

"MR. HIGHSMITH: Yes

"THE COURT: Okay. For what it's worth, as far as this hearing, I don't think it's worth much but I agree with Judge Harrison's decision not to allow the amendment at the time of trial. Recess was taken, the D.A. made a conscious decision to dismiss the case, obviously hoping that a municipal court judge would find under 1387 that the dismissal was based on excusable neglect.

"The legislative intent behind the applicable statute, 1387.1, is important it seems to me. As I recall, the People, the prosecution, used to be able to proceed with limitless dismissals, subject to constitutional considerations, and because of occasional fundamental unfairness to defendants, legislation was passed, limiting the number of dismissals in felony cases to two. I'm taking a look at 1387.1, which was passed in 1987, and an exception to that was recognized for violent felonies; murder is a violent felony, and based on that an additional refiling a third time is permitted if either of the previous two dismissals were based solely on excusable neglect.

"Refiling is not permitted if the People's conduct amounts to bad faith. Now, I don't see any bad faith in this case. Witkin tells us that error by the People may be excusable neglect. There is clearly neglect by the People by a number of attorneys, experienced attorneys, and by what appears according to the testimony to be a competent staff. I guess the question before me is, shall I excuse this admittedly negligent conduct.

"In considering whether or not the neglect in this case is excused, the primary factor I'm looking at is whether or not this defendant is prejudiced by the way this case has been handled. Any defendant is prejudiced by being charged with a crime, being incarcerated, held without bail or a high bail. Now, in this case is the defendant prejudiced by the third filing? What is the effect on this defendant? A review of the record shows that there was no surprise in the Superior Court, in my opinion, based on my review of all the records, and if the third refiling is allowed she will be facing, once more, the charges she already knew about and decided to ignore in Superior Court. That was her tactical decision. The D.A. finally recognized the charging problem on the day of trial and may a conscious decision to not proceed with one half of the case. Mr. Highsmith articulated the reason, and I have no reason to doubt him that he was seeking a special circumstances allegation. He pointed out that even if the defendant were convicted of two murders if

they were a result of two separate proceedings she would not get the punishment they were seeking which is apparently life without the possibility of parole.

"Now, the defendant, who is free from any burden of proof, chose to silently proceed in Superior Court and the D.A. chose to dismiss and refile. In my opinion the D.A.'s office was not playing games or vindictive. He said the first dismissal was a result of not being ready to proceed. They tried to find a witness, they couldn't find him, they dismissed it. In the second case, apparently, he was available. They say they weren't ready to proceed on both counts, only one, the murder of Benavidaz [sic], but they chose not to, and I don't think they were playing games, dropping the ball at that time. There is no evidence, in my opinion, they were vindictive in any way, although there was evidence they were clearly negligent.

"In my opinion the repeated filings by the People do not amount to a denial of any right of a constitutional magnitude. Specifically, there doesn't appear to be any due process violation and no due process violation is alleged by the defense. No speedy trial violation is alleged or shown, so in my opinion the previous dismissals are neither vindictive or malicious. In short, the refiling of the charges of which the defendant was already aware and prepared to defend inflicts no prejudice on her.

"In my opinion, human error or poor workmanship by the People, which is clearly present, was not intended by the legislature to prohibit a trial on the merits. I think there should be a trial on the merits, right or wrong the second dismissal in this case was a result of excusable neglect within the meaning of Penal Code Section 1387.1. The third complaint will be allowed. Now, shall I confirm the preliminary hearing date?

"Ms. Voss: Yes.

"THE COURT: Thank you.

"(Whereupon the matter concluded.)"