Filed 10/17/13  P. v. Thomas CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>DEONTRAY DESHON THOMAS,<br><br>    Defendant and Appellant. | F063867<br><br>(Super. Ct. No. BF135794A)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  John S. Somers, Judge.

Donn Ginoza, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Kari L. Ricci, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Following a plea to a violation of Penal Code[1] section 273.5, subdivision (a) and the imposition of a four-year sentence, defendant Deontray Deshon Thomas appeals his conviction. He argues the trial court abused its discretion when it granted his motion made under *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*) because it failed to consider whether he lacked the mental capacity to represent himself at trial. Defendant also contends that failure resulted in an invalid waiver, thus, denying him his constitutional right to counsel. We affirm the judgment.

## BRIEF PROCEDURAL SUMMARY

In an information filed April 14, 2011, it was alleged defendant committed the following violations: count 1—assault with a deadly weapon (§ 245, subd. (b)); count 2—willful infliction of corporal injury upon a cohabitant (§ 273.5, subd. (a)); count 3—criminal threat (§ 422); count 4—unlawful taking of a vehicle (Veh. Code, § 10851, subd. (a)); count 5—unlawful possession of a firearm by a felon (former § 12021, subd. (a)(1)); and count 6—active participation in a criminal street gang (§ 186.22, subd. (a)). A gang enhancement was also alleged (§ 186.22, subd. (b)(1)) as to counts 1, 2, 3, and 5. A firearm enhancement was alleged (§ 12022.5, subd. (a)) as to counts 1, 2, 3, and 4. Additionally, it was alleged defendant had a prior strike (§§ 667, subds. (c)-(j), 1170.12, subds. (a)-(e)) and a prior serious felony conviction for attempted first degree burglary (§ 667, subd. (a)). Finally, it was also alleged defendant had served two prior prison terms. (§ 667.5, subd. (b).)

On April 22, 2011, defendant pled not guilty to all counts and denied all allegations.

Subsequently, the trial court granted defendant's motion to set aside the section 186.22, subdivision (b)(1) enhancement as to counts 1, 2, 3, and 5.

---

[1]All further statutory references are to the Penal Code unless otherwise indicated.

Thereafter, a series of *Marsden* (*People v. Marsden* (1970) 2 Cal.3d 118) motions made or filed by defendant were heard and denied.

Jury trial commenced August 18, 2011, with motions in limine argued and considered over two days.  On the second day of trial, defendant made yet another *Marsden* motion; it was denied.  Defendant's subsequent *Faretta* motion was granted.

On August 23, 2011, the trial court granted defendant's request for a 30-day continuance, but denied his request for cocounsel.  Later that same morning, defendant entered a conditional plea:  that he serve no more than four years in prison in exchange for pleading no contest to a violation of section 273.5, subdivision (a).

After denying defendant's motions to withdraw his plea, the trial court eventually sentenced defendant to four years in state prison.

## BRIEF FACTUAL SUMMARY[2]

On February 27, 2011, Toya Tarkington reported she had been assaulted by defendant.  More particularly, she indicated her boyfriend punched her in the head, face, chest and back.  At one point, he produced a handgun, pointed it at Tarkington's head, and told her he was going to kill her.  The assault continued briefly before defendant took Tarkington's keys and left in her car.  Although Tarkington declined medical assistance, law enforcement personnel noted bruising to her face and shoulder.

## DISCUSSION

### The *Faretta* Motion

Defendant contends the trial court erred in granting his *Faretta* motion because it employed an incorrect standard in assessing his ability to conduct himself during trial. He argues the trial court's reference to *People v. Nauton* (1994) 29 Cal.App.4th 976 during the hearing meant it was unaware of the rules of *Indiana v. Edwards* (2008) 554 U.S. 164 and *People v. Johnson* (2012) 53 Cal.4th 519 applicable to *Faretta* motions.

---

[2]The factual summary is taken from the probation officer's report.

The People assert the trial court exercised its sound discretion in allowing defendant to represent himself and, thus, no error occurred.

**The Relevant Proceedings Below**

On the morning of August 22, 2011, the trial court noted defendant's appearance and, particularly, the fact he was not dressed out for trial. When defense counsel was asked about the issue, he indicated defendant refused to speak with him, but that the bailiff had advised him defendant was refusing to dress out for trial. The following colloquy then occurred:

> "[THE COURT:] [S]ir, I know you did have clothes available at Lerdo. Was there a mix-up or a problem in terms of getting dressed out this morning or what is the reason that you're not dressed out this morning, sir?

> "THE DEFENDANT: Because I felt like, you know, I no longer can proceed with [defense counsel] on a caseload with me, and I'm not going to sit here and act like me and [defense counsel] get along and we really don't.

> "It's always been a break in communication and lack of communication and trust, and I'm not—I'm not going to proceed with [defense counsel] on my caseload. If I got to go pro per, I go pro per. Just ain't no trust there.

> "THE COURT: For the record, without getting into the details of it, because it is a closed hearing and is sealed and [the prosecutor] is present with us at the present time, there was a Marsden motion brought and heard on Friday, I believe it was, first thing in the afternoon shortly after lunch, if I'm not mistaken. And, obviously, I will not go into the details of that at this point in time.

> "As I understand it, what you're telling me is that, because you're not happy with your current representation, that's why you have chosen not to dress out. Is that correct, sir?

> "THE DEFENDANT: Yes, your Honor.

> "THE COURT: I'm not sure I understand the connection between the two. Can you maybe explain that to me, because I'm not quite following why one would have anything to do with the other.

> "THE DEFENDANT: I mean [defense counsel]—he disrespectful to my mom.

"THE COURT:  I know how you feel about [defense counsel], and I don't want you to be in a position of having to get into that too much in front of the Deputy DA.  [¶] Why is not dressing out connected to [defense counsel]'s representation, whatever you may feel?

"THE DEFENDANT:  I don't trust [defense counsel] whatsoever.  I feel like I can't proceed on this case.

"THE COURT:  There is one comment that, for purposes of the record, I need to follow-up on at this point in time.

"[Y]ou said something about you're not going to proceed with [defense counsel] as your attorney at this point and made a comment about going pro per.  [¶] Are you—not inviting anything you're not asking me to you do, [*sic*] because—

"THE DEFENDANT:  Whatever.

"THE COURT:  Wait a minute.  One has a constitutional right to do so.  It is generally—it is, frankly, almost always unwise for someone to represent themselves, but are you asking the Court to discharge your attorney and proceed representing yourself—

"THE DEFENDANT: That's what—

"THE COURT:  —at this point?

"THE DEFENDANT:  If that's what I got to do to get him off my case, that's what I want to do.

"THE COURT:  I only want you to do that if that's what you want to do as far as your case and if that's what you think is in your best interest.

"THE DEFENDANT:  Be in my best interest.  Maybe I feel I can win a case or maybe I feel I got a better chance.  I feel like he working with the DA anyways.

"THE COURT:  Before proceeding with that request, … you understand that this matter is in trial now?  [¶] We have a jury panel which is reserved and which we're going to bring over to begin jury selection on the case later on this morning.  So if you do discharge your counsel or seek to do that and represent yourself on the matter, then you would be expected, and need to be prepared, to proceed on the matter immediately, because it's prejudicial to the People to go forward or to basically have this stalled at the last moment when they have done everything they can in good faith to become prepared to proceed.

5.

"You have counsel who is prepared to proceed. And we've already spent basically—though we have not yet selected a jury, we've spent the better part of two whole days already conducting motions in limine on this case. Do you understand that? [¶] I need you to answer out loud.

"THE DEFENDANT: Yes, your Honor.

"THE COURT: I want to make sure just that the answer is clear for the record. I can see you nodding the head one way or the other, but it's hard for the court reporter to take down.

"Mr. [Prosecutor], I haven't asked the People to provide any input on anything because, up to this point. Obviously dealing with the issue of representation, to the extent that it presents a conflict or Marsden-type issue, that is between counsel and the defendant, and no disrespect but it isn't the People's business.

"And, in addition, with regards to [defendant] being dressed out or not being dressed out, that's entirely a matter of his choice. Though I think it wise for him to be dressed in civilian clothing, he's not obligated to do that if he doesn't wish to do so.

"However, with regards to the issue of self-representation, it does appear to me there is a request being made for that at this point in time.

"Your comments, if any, with respect to that at this point?

"[PROSECUTOR]: I would object to timeliness.

"THE COURT: All right.

"[PROSECUTOR]: And I would object to any continuance.

"THE COURT: So you understand … that the People are going to be—if you proceed with that request, the People are going to be objecting to the motion, number one, on the grounds that it's untimely, that is being made too late in the proceedings, and in connection with that they're going to be objecting to any continuance of the trial because they are ready, prepared to proceed and have their witnesses available and so forth. Do you understand that?

"THE DEFENDANT: Yes, your Honor.

"THE COURT: Okay. At this point we're going to go off the record for just a couple of minutes. I am going to—while we're off the record we're going to do two things.

6.

"Number one, we have a written advisal and waiver form regarding self-representation or so-called Faretta motion. We are going to get a copy of that for you … and give you an opportunity to read over that, review that. [¶] And then when we go back on the record we'll proceed with your motion. You can state the reasons for it.

"I also want to take the time to go over that form and make sure you're fully advised with regards to any potential pitfalls or dangers to your case, of which there are some being involved in representing yourself. I want to make sure before you proceed with the motion and I hear it that you're fully advised. Okay?

"So we'll do that during the recess and give you an opportunity to review that."

When the proceedings resumed following recess, the court reviewed the "Faretta Waiver" form with defendant. It made specific inquiries based upon defendant's selections or responses on the form:

"THE COURT: Okay. Turning to the second page, the advisal in number seven[3] at the top of the page states, quote: Do you understand that if you are in custody you will receive no more library privileges than those available to other persons representing themselves?

"You will receive no extra time for preparation, and you will have not have a staff of investigators at your disposal. [¶] … [¶]

"You circled the answer no to that and placed the initials DT.

"What I want to make sure is that you understand what's stated in in [sic] that. If you are in custody, you will receive the same library privileges as all other individuals who are representing themselves and will not receive any additional or extra time for preparation nor will you have a staff of investigators at your disposal.

"Do you understand those things?

"THE DEFENDANT: Yes, your Honor.

"THE COURT: Okay. Why did you circle no in response?

---

[3]Later in the proceedings, the trial court again clarified number seven on the waiver form. Defendant acknowledged number seven was the only portion of the form he had any difficulty with.

7.

"THE DEFENDANT:  Because I'm up in D pod, and like before officers, you know, I be really like having a rough time and I ask for the law forms and requests to go to the law library, they be slow dragging.  So like, you know, I—basically—the officers—the officers time—and it's like when we ask for law forms, we can request to the law library.  I guess they be forgetting sometimes.

"Basically they be like slowing us down to get the forms.  We request those at the law library.

"So if I be behind on going to the law library to study and read and stuff is basically because I be on they time.

"THE COURT:  If you have any problems with the speed of the access, bring that to the Court's—initially bring it to the attention of the officers in that pod and let them know that you're representing yourself in an effort to speed that up.  If that does not suffice, bring that to the Court's attention, and I'll address the matter.  Okay?

"THE DEFENDANT:  All right.

"THE COURT:  However, you do need to understand that while the Court will see that you get the same access as far as library privileges, time for preparation and so forth as all other individuals representing themselves, you're not going to receive anything extra above and beyond what anybody else in that same situation gets.

"Do you understand that?

"THE DEFENDANT:  Yes, sir.  I understand, your Honor.

"THE COURT:  Next, I wanted to ask you with respect to question eight, because that is not filled in.  That question eight would normally list the various charges in this particular case."

The court then reviewed with defendant each count alleged,[4] including enhancements.

Defendant indicated he understood.  The court then addressed the issue central to this

appeal:

"THE COURT:  Now, … in the form you indicate in answer to question number ten that your formal education includes high school education.  Is that correct, sir?

---

[4]The judge completed this portion of the form.

8.

"THE DEFENDANT: Yes, your Honor.

"THE COURT: Okay. Did you—where did you attend high school, sir?

"THE DEFENDANT: At West High School.

"THE COURT: Did you graduate from West High School?

"THE DEFENDANT: No, your Honor.

"THE COURT: How far did you go?

"THE DEFENDANT: Eleventh grade.

"THE COURT: You completed the eleventh grade?

"THE DEFENDANT: Yes, your Honor.

"THE COURT: So essentially, from a credit standpoint, you're basically one year short of high school graduation; is that correct?

"THE DEFENDANT: Yes, your Honor.

"THE COURT: You indicated in the form that English is your primary language. Is that correct?

"THE DEFENDANT: Yes, your Honor.

"THE COURT: All right. And, sir, in answer to question number 12 I need to ask you a question with respect to that so I understand your answer.

"You state in answer to that—it states, quote, the question, have you been treated for any emotional or mental illnesses? In answer to that you circled and stated and initialed that, and explaining that in detail you state I was on SSI for being slow as a kid. Is that correct?

"THE DEFENDANT: Yes, your Honor.

"THE COURT: Can you explain to me what that means to you in a little bit more detail?

"THE DEFENDANT: I mean base everything—explain it right there.

"THE COURT: Do you know if you were found to be developmentally disabled?

9.

"I know they use various terms for things sometimes, and that's why I ask.

"THE DEFENDANT: Yeah.

"THE COURT: Okay. You said that you received SSI for that.

"Did you at any point in time, either while you were growing up or since you've been an adult, receive any kind of treatment—or not sure the treatment is exactly the right word—but assistance for that or any special education facilities?

"THE DEFENDANT: Yeah.

"THE COURT: Or assistance while you were in school?

"THE DEFENDANT: I had—I was in special ed.

"THE COURT: Can you tell me—that was while you were in school. Can you tell me a little more about that?

"THE DEFENDANT: I was—I kind of had like reading problems, comprehending, catching on. That was basically it. I never had no treatment or medication.

"THE COURT: So it's basically kind of a—sounds like, correct me if I'm wrong, some sort of a disability or difficulty with reading and comprehending written information. Is that correct?

"THE DEFENDANT: Yes, your Honor.

"THE COURT: Now, in this particular case, obviously, as in most cases, a lot of what we're doing in court proceedings take place as far as speaking orally and everything.

"Have you had any difficulty understanding what we've discussed in court during the course of the pretrial motions over the last couple of days as it's been spoken in court?

"THE DEFENDANT: A little bit.

"THE COURT: Okay.

"THE DEFENDANT: Just a little bit.

"THE COURT: Does that apply to just what's been going on generally or does that happen when we—because sometimes in court

10.

proceedings lawyers and the judge will use legal terminology or kind of lawyer shorthand for things. We'll refer to something as, for example, a Marsden motion or a motion to bifurcate, things like that, using legal terminology or shorthand, and we use it because we know what it refers to.

"Has that been the situation where you're having difficulty what's being said in court or has it been a little bit broader from that [*sic*]?

"THE DEFENDANT: Yes.

"THE COURT: Using the kind of terminology or things like that?

"THE DEFENDANT: Yes.

"THE COURT: If at any point in time during the proceedings either [the prosecutor] or I use legal terminology that you do not understand, stop me and let us know, and I will—although the Court, obviously, cannot conduct your defense for you or assist you with the conduct of the defense—just as I would with a witness, it is important that all parties understand what is being said during the proceedings. If we at times slip into legal shorthand or terminology that you don't follow or understand, please politely tell me that, and we'll stop, and I'll make clear what we're talking about. Fair enough?

"THE DEFENDANT: Yes, your Honor.

"THE COURT: Other than that have you had any difficulty understanding what's been said in court?

"THE DEFENDANT: No, your Honor.

"THE COURT: I do want to focus a little bit on the reading issue for a moment, because you did indicate that during school, what you characterized as being slow, was to some extent a difficulty with comprehending written material and reading. Is that correct?

"THE DEFENDANT: Yes, your Honor.

"THE COURT: You may not know the answer to this, sir, but if you do—do you know what your—when you left or finished school what your reading level was assessed at?

"Were you at grade level for eleventh grade or above that, below that?

"THE DEFENDANT: Below that.

11.

"THE COURT:  Okay.  Do you know how much below?  [¶] Again, you may not know.

"THE DEFENDANT:  I don't remember my test.  I couldn't remember what it was.

"THE COURT:  So little bit below eleventh grade level, but you're not sure exactly how much?

"I need you to answer out loud.

"THE DEFENDANT:  Yes, your Honor.

"THE COURT:  I could see the nod of the head.  It's hard for the court reporter.

"[S]ir, with respect to this proceeding now, a lot of the—obviously, necessarily, because of much of what we do in the law is based on words.  We, obviously, discuss things in court, but there also a lot of the information is contained in written documents such as police reports, transcripts of previous proceedings or recorded interviews, written motions and things of that nature.  [¶] … [¶] … With respect to any documents that you may have read, have you had any difficulty understanding those?

"THE DEFENDANT:  No.  Have no difficulty.

"THE COURT:  With regards to the reading issue when you were in school, was that a question of you could—comprehension of a question, you could understand things so long as you had sufficient time but you perhaps read slower than perhaps other people or did you have difficulty understanding what was in writing even if you had enough time to read through it?

"THE DEFENDANT:  I had like difficult [*sic*].

"THE COURT:  So you had some difficulty even reading the materials even if you had essentially unlimited time to read them?

"THE DEFENDANT:  Yes, your Honor.

"THE COURT:  … I want you to answer this for me based solely on whether or not, on the basis of your question of your ability to represent yourself, do you—strike that.

12.

"Do you, sir, believe that you are able to read sufficiently well to be able to read and understand what is in court documents and any police reports and other documents you need to read in this case?

"THE DEFENDANT: Yes, your Honor.

"THE COURT: Okay. Now, in answering question 13, it asks: Have you had any difficulties reading and understanding this form? You wrote yes but circled no. In reading the form, have you understood the form?

"THE DEFENDANT: Yes, your Honor.

"THE COURT: Okay. All of the advisals and the questions in the form, do they make sense to you?

"THE DEFENDANT: Yeah, they do.

"THE COURT: Okay. And do you understand the form itself?

"THE DEFENDANT: Yes, your Honor."

In making its ruling, the trial court stated that defendant made a knowing and intelligent waiver of his constitutional rights and, specifically, that while defendant indicated he has some "difficulty in digesting reading materials, he has been able to read and comprehend and understand the form in this particular case …. I will characterize the form as, frankly, being written at a level that at least requires a high school education to be able to fully comprehend it." Thereafter, defense counsel was relieved from further representation of defendant and was directed to provide defendant with all materials.

**Analysis**

### *The Law at the Time of Trial*

In *Faretta*, *supra*, 422 U.S. 806, the United States Supreme Court held the Sixth Amendment to the United States Constitution gives criminal defendants the right to represent themselves. Before *Faretta* was decided, the law in California had been that a criminal defendant had no constitutional or statutory right to self-representation except, in noncapital cases, the trial court had discretion to grant a defendant's request for self-representation. (*People v. Sharp* (1972) 7 Cal.3d 448, 459, 461, 463-464.)

13.

"In the wake of *Faretta*'s strong constitutional statement, California courts tended to view the federal self-representation right as absolute, assuming a valid waiver of counsel." (*People v. Taylor* (2009) 47 Cal.4th 850, 872.) Thus, a trial court had to grant a defendant's request for self-representation if the defendant voluntarily and intelligently elected to do so, even if the defendant, though competent to stand trial, was not competent to serve as his or her own attorney. (*Id*. at pp. 872-873.)

In *Godinez v. Moran* (1993) 509 U.S. 389, the United States Supreme Court appeared to confirm that a separate competence requirement for self-representation did not exist under federal law. In *Godinez*, the defendant sought and was allowed to waive assistance of counsel and pleaded guilty to murder charges in state court. (*Id*. at pp. 391-393.) During habeas corpus proceedings, the federal appeals court held that even though the defendant was competent to stand trial, he was not competent to waive counsel and plead guilty. (*Id*. at pp. 393-394.) The Supreme Court reversed, rejecting the argument that federal law required a higher standard of competence for waiving counsel or pleading guilty than is required to stand trial. (*Id*. at p. 402.) California courts, including the California Supreme Court, generally interpreted *Faretta* and *Godinez* as holding the required degree of competency to stand trial and the required degree of competency to waive the right to counsel were the same. (*People v. Taylor*, *supra*, 47 Cal.4th at pp. 874-876.)

In 2008, the United States Supreme Court decided *Indiana v. Edwards*, *supra*, 554 U.S. 164. In that case, the Indiana state trial court had denied the defendant's request for self-representation and found that, while the defendant was competent to stand trial, he was not competent to represent himself at trial. (*Id*. at p. 169.) An Indiana appellate court ordered a new trial, and the Indiana Supreme Court affirmed the appellate court on the ground *Faretta* and *Godinez* required the trial court to permit the defendant to represent himself. (*Indiana v. Edwards*, *supra*, at p. 169.) The United States Supreme Court reversed, holding:

"[T]he Constitution permits judges to take realistic account of the particular defendant's mental capacities by asking whether a defendant who seeks to conduct his own defense at trial is mentally competent to do so. That is to say, the Constitution permits States to insist upon representation by counsel for those competent enough to stand trial under *Dusky [v. United States* (1960) 362 U.S. 402] but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves." (*Indiana v. Edwards*, *supra*, 554 U.S. at pp. 177-178.)

The court called those defendants who are competent to stand trial but not to represent themselves "gray-area defendants." (*Id*. at pp. 172-173.)

*Indiana v. Edwards* did not hold that due process requires a higher standard of mental competence for self-representation than is required to stand trial with counsel. Rather, "[t]he *Edwards* court held only that states *may*, without running afoul of *Faretta*, impose a higher standard …." (*People v. Taylor*, *supra*, 47 Cal.4th at pp. 877-878.) In *Taylor*, the California Supreme Court upheld the trial court's decision to grant the defendant's request for self-representation. (*Id*. at pp. 856, 868, 878-879.) Because *Edwards* did not mandate the application of "'a dual standard of competency for mentally ill defendants,'" that case "does not support a claim of federal constitutional error in a case like the present one, in which defendant's request to represent himself was granted." (*People v. Taylor*, *supra*, at p. 878.)

The *Taylor* court also rejected the defendant's argument the trial court should have exercised its discretion, recognized in *Edwards*, to apply a higher standard than competence to stand trial. (*People v. Taylor*, *supra*, 47 Cal.4th at p. 879.) "We reject the claim of error because, at the time of defendant's trial, state law provided the trial court with no test of mental competence to apply other than the *Dusky* standard of competence to stand trial [citation], under which defendant had already been found competent." (*Ibid*.)

Such was the state of the law in this case when defendant requested self-representation. Here, as in *Taylor*, the trial court's decision to grant the request for self-representation did not support a claim of federal constitutional error. At the time of

defendant's trial, California state law did not provide a standard of competence for self-representation different from the standard required to stand trial.  As defendant does not deny he was competent to stand trial, he likewise met the competency standard to represent himself at trial.

### *The Law Posttrial*

In 2012, after defendant pled guilty and shortly after he filed his notice of appeal, the California Supreme Court decided *People v. Johnson*, *supra*, 53 Cal.4th 519.  In that case, the trial court revoked the defendant's self-representation.  (*Id*. at p. 525.)  The Supreme Court had to decide "whether California courts may accept *Edwards*'s invitation and deny self-representation to gray-area defendants."  (*Id*. at p. 527.)  That court concluded that California trial courts have discretion to deny self-representation to gray-area defendants.  The court reasoned:

> "Indeed, to refuse to recognize such discretion would be inconsistent with California's own law.  In *People v. Floyd* [(1970)] 1 Cal.3d 694, we upheld the denial of a capital defendant's request for self-representation citing, among other factors, his youth, his low level of education, and his ignorance of the law.  [Citation.]  Certainly, a defendant who could be denied self-representation under *Edwards*, *supra*, 554 U.S. 164, could also have been denied self-representation under *People v. Sharp*, *supra*, 7 Cal.3d 448, and *People v. Floyd*.  Denying self-representation when *Edwards* permits such denial does not violate the Sixth Amendment right of self-representation.  Because California law provides *no* statutory or constitutional right of self-representation, such denial also does not violate a state right.  Consistent with long-established California law, we hold that trial courts may deny self-representation in those cases where *Edwards* permits such denial."  (*People v. Johnson*, *supra*, at p. 528.)

The *Johnson* court considered several standards by which to measure competence and concluded:  "[P]ending further guidance from the high court, we believe the standard that trial courts considering exercising their discretion to deny self-representation should apply is simply whether the defendant suffers from a severe mental illness to the point where he or she cannot carry out the basic tasks needed to present the defense without the help of counsel."  (*People v. Johnson*, *supra*, 53 Cal.4th at p. 530.)

16.

Here, defendant contends he met that standard, i.e., he suffered mental illness to the point he could not carry out the basic tasks to defend himself without counsel. *Johnson* was decided after defendant was to be tried, and after he entered a guilty plea. Therefore, its holding does not apply retroactively. Changes in the law—either through legislation or court opinion—that govern the conduct of trials apply prospectively only. (*People v. Johnson*, *supra*, 53 Cal.4th at p. 531.) "'[A] law governing the conduct of trials is being applied "prospectively" when it is applied to a trial occurring after the law's effective date, regardless of when the underlying crime was committed ….'" (*Ibid*., quoting *Tapia v. Superior Court* (1991) 53 Cal.3d 282, 289.) Application of a change in law that occurred after the crime took place is retroactive only if it changes the legal consequences of a defendant's past conduct. (*Tapia v. Superior Court*, *supra*, at p. 298.) In this case, the *Johnson* decision did not change the legal consequences of defendant's past conduct. He pled no contest to a violation of willful infliction of corporal injury to a cohabitant; the legal consequences of that conduct were not affected.

Moreover, even under the *Johnson* standard for competence, the trial court did not err by granting defendant's request for self-representation. "As with other determinations regarding self-representation, we must defer largely to the trial court's discretion." (*Johnson*, *supra*, 53 Cal.4th at p. 531.) "The trial court's determination regarding a defendant's competence must be upheld if supported by substantial evidence." (*Ibid*.)

Here, substantial evidence supported the trial court's decision permitting defendant to represent himself. The trial court had observed defendant during two full days of pretrial motions and also had the chance to observe and assess defendant during the *Marsden* motion heard August 19, 2011. The trial court very thoroughly and meticulously reviewed the waiver of counsel form with defendant. On the form, defendant indicated he had received assistance as a child for being "slow," but after an extensive inquiry, the trial court concluded that, despite defendant's mild reading and comprehension deficits, he was capable of representing himself at trial. The trial court did not abuse its discretion in so finding. Contrary to defendant's assertion, the trial court

17.

was not required to obtain an expert's opinion regarding defendant's ability to represent himself at trial. This record does not indicate defendant "'suffer[s] from severe mental illness to the point where'" he cannot "'carry out the basic tasks needed to present [a] defense without the help of counsel.'" (*People v. Johnson*, *supra*, 53 Cal.4th at p. 530.) The trial court took a realistic account of defendant's mild—not severe—reading difficulty and determined defendant was capable of representing himself despite the mild deficit. We perceive no error.

In explaining its decision, the trial court stated, in relevant part, as follows:

> "THE COURT: At this point in time the Court has no further inquiry in making a determination as to whether or not the defendant is capable of representing himself.

> "While the Court may inquire as I have to determine if the defendant has sufficient—I don't mean it to sound derogatorily, because it isn't meant to be that way or critical—the Court needs to make a determination the defendant has sufficient intelligence and mental capacity to represent themselves, the Court does not and cannot inquire as to the technical knowledge of the law or ability to litigate a case.

> "The relevant inquiry from the Court's perspective pursuant to the Faretta versus California decision at 422 US 806 page 835, and People versus Nauton, N-a-u-t-o-n, at 29 Cal.App.4th 976, is does the defendant have the mental capacity to make a knowing and intelligent waiver of his right to be represented by counsel in this case."

Defendant asserts the trial court's reference to the *Nauton* decision is evidence the trial court did not understand its discretion. However, the trial court stated the correct general standard for determining whether a defendant may represent himself. It noted a defendant must knowingly and voluntarily elect self-representation. Although the court did not reference the authority that followed *Faretta* pertaining to consideration of a defendant's request where that request was accompanied by the presence of or a presumption of mental illness, it did consider defendant's purported reading and comprehension deficits. Those deficits factored into its determination of whether defendant would be able to represent himself at trial and whether he was knowingly and

intelligently giving up his right to be represented by counsel at trial. On appeal, we presume the court was aware of the applicable standards and applied them to the facts in this case. (*People v. Coddington* (2000) 23 Cal.4th 529, 644, overruled on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13 [reviewing court presumes trial court knew and applied correct statutory and case law]; *Ross v. Superior Court* (1977) 19 Cal.3d 899, 913 [in absence of contrary evidence, reviewing court presumes trial court properly followed established law]; *People v. Woods* (1993) 12 Cal.App.4th 1139, 1152 [reviewing court presumes trial court knew and properly applied the law; appellant's burden to rebut presumption by affirmative showing]; *People v. Nance* (1991) 1 Cal.App.4th 1453, 1456 [reviewing court presumes trial court knew and applied the correct statutory and case law in exercise of its discretion]; *People v. Mack* (1986) 178 Cal.App.3d 1026, 1032; see also Evid. Code, § 664.) The trial court's reference to *Nauton*—a case recently cited by the California Supreme Court in *People v. Taylor*, *supra*, 47 Cal.4th at pages 875-881—does not affirmatively establish the court was unaware of its discretion pursuant to *Edwards*.

A review of this record strongly suggests defendant was "playing 'the *Faretta* game'" and was able to delay the trial "by juggling his *Faretta* rights with his right to counsel interspersed with *Marsden* motions." (*People v. Williams* (1990) 220 Cal.App.3d 1165, 1170.) As the court noted at a hearing on defendant's motion to withdraw his plea:

> "THE COURT: I'm not buying it …. [¶] Right now the blunt fact of the matter is that it's pretty clear to me you didn't want [defense counsel] to represent you.
>
> "Multiple Marsden motions have been denied. Frankly, at this point in time, if one looks at the whole record of this case, it appears to me that the reason you made a Faretta motion and are now seeking to try to withdraw your plea was basically as an end run to get around multiple previous denials of that Marsden motion. You clearly understood what we were discussing in court on the previous occasions when you were here representing yourself and you did during the proceedings last week and

19.

during the earlier proceedings now. [¶] I'm flat out finding at this point in time that this is an attempt to deceive the Court."[5]

In sum, the trial court did not err in granting defendant's *Faretta* motion. Defendant knowingly and voluntarily waived his constitutional right to the assistance of counsel. Further, the trial court properly considered defendant's mild reading and comprehension deficits before determining he was capable of representing himself at trial.

### *The Validity of the Waiver*

Defendant asserts that because the trial court did not "conduct[] an adequate inquiry" as to his mental capacity, placing him in a "position where he immediately realized that he was incapable of proceeding on his own" and he "suddenly reverses to a conviction by plea," his Sixth Amendment rights to the assistance of counsel and the presentation of a defense have been violated. He contends a proper inquiry would have led to expert reports "pointing precisely to the types of functional impairments the *Edwards* court cited …."

We have already determined the trial court did not err in granting defendant's *Faretta* motion. Therefore, the basis upon which defendant's second argument rests is invalid. The argument lacks merit and is largely a restatement of the earlier argument.

We do not agree defendant's unsuccessful request for advisory counsel[6] in the wake of the trial court's decision to grant his *Faretta* motion results in "a legitimate inference that his election to resume plea negotiations was the result of his recognition that he was incapable of representing himself." Rather, on this record, the legitimate

---

[5]We note defendant also tried, unsuccessfully, to delay proceedings further following the trial court's comments by disingenuously claiming he did not understand the court's questions regarding a waiver of time for purposes of sentencing.

[6]Once a defendant elects self-representation, the defendant does not have the constitutional right to appointment of advisory or standby counsel to assist in his or her defense, and the trial court has the discretion to grant or deny such a motion. (*People v. Sullivan* (2007) 151 Cal.App.4th 524, 553-554.)

20.

inference is that defendant was simply out of alternatives. He succeeded in getting his defense counsel removed as his attorney, and his request to represent himself was properly granted. Notably too, defendant was granted a 30-day continuance, despite the fact the trial had already commenced and a jury panel had been assembled. He had but two choices: proceed to trial or accept a plea. Defendant elected the latter.

Moreover, it is pure speculation for defendant to assert that "expert reports would likely have been generated pointing precisely to the types of functional impairments the *Edwards* court cited …."

> "'… A defendant seeking to represent himself "should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.' [Citation.]" (*Faretta*, *supra*, 422 U.S. at p. 835.) "No particular form of words is required in admonishing a defendant who seeks to waive counsel and elect self-representation." (*People v. Koontz* (2002) 27 Cal.4th 1041, 1070.) Rather, "the test is whether the record as a whole demonstrates that the defendant understood the disadvantages of self-representation, including the risks and complexities of the particular case." (*Ibid.*; accord, *People v. Lawley* (2002) 27 Cal.4th 102, 140; *People v. Marshall* (1997) 15 Cal.4th 1, 24.)' (*People v. Blair* (2005) 36 Cal.4th 686, 708.) Thus, '[a]s long as the record as a whole shows that the defendant understood the dangers of self-representation, no particular form of warning is required.' (*People v. Pinholster* (1992) 1 Cal.4th 865, 928-929; accord, *U.S. v. Lopez–Osuna* (9th Cir. 2001) 242 F.3d 1191, 1199 ['the focus should be on what the defendant understood, rather than on what the court said or understood'].)
>
> "On appeal, we independently examine the entire record to determine whether the defendant knowingly and intelligently waived the right to counsel. (*People v. Doolin* (2009) 45 Cal.4th 390, 453.)" (*People v. Burgener* (2009) 46 Cal.4th 231, 241.)

After ensuring that defendant understood he faced a potential of 41 years in prison were he to be convicted of all counts, the following colloquy occurred regarding defendant's waiver:

> "THE COURT: [I]n answer to that you stated that you wish to represent yourself because, quote, because I been effectively by [defense counsel] who never—I'm not sure what the word s-u-m-e-n-t—discover on

21.

my case and did nothing in my defense. [¶] I know that you have not been satisfied with [defense counsel]'s representation.

"THE DEFENDANT: Yes, your Honor.

"THE COURT: Without going into the details as far as the Marsden motion is concerned, is it because of your dissatisfaction with that representation that you're seeking to represent yourself?

"THE DEFENDANT: Yes, your Honor.

"THE COURT: Again, without going into detail, all you need to do is tell me yes or no, is it your desire to conduct your defense differently than [defense counsel] feels or has indicated he feels it is appropriate to conduct that defense? [¶] I don't want you to go into detail, because [the prosecutor] is present. That's just a yes or no.

"THE DEFENDANT: Yes.

"THE COURT: Okay. So there's not necessarily a conflict of interest, but there is a disagreement or conflict as far as strategy between [defense counsel] and yourself. Is that correct?

"THE DEFENDANT: It's both. It's all.

"THE COURT: So you feel that there is a conflict in strategy, but also you feel just generally there is a conflict in terms of his representation?

"THE DEFENDANT: Yes, your Honor.

"THE COURT: Fair enough. Okay.

"Now, … I'm going over a couple of these because, like I said, I want to make sure you understand the consequences of representing yourself. [¶] You understand that, assuming that you are capable of making a knowing and intelligent waiver of your right to a lawyer, that you do have a constitutional right to represent yourself. Do you understand that?

"THE DEFENDANT: Yes, your Honor.

"THE COURT: I do want to make doubly sure, though, that you understand you also do have the constitutional right, even if you cannot afford one, to be represented by a lawyer. Do you understand that?

"THE DEFENDANT: Yes, your Honor.

"THE COURT: Okay. Although there are many—I won't say many, but there are folks who represent themselves in criminal proceedings when they are charged with a crime. Sometimes those proceedings wind up in a result they're satisfied with. Although many times, perhaps more often, they don't.

"Generally speaking it is virtually always unwise for someone, frankly even if they are a lawyer, to represent themselves when they are charged with a crime. [¶] Do you understand that?

"THE DEFENDANT: Yes, your Honor.

"THE COURT: Part of the reason for that is that while certainly, as in many cases, that person is unfamiliar with and untrained in the law, even in the case of a lawyer it is very often unwise for the lawyer to represent themselves, because being personally involved in a proceedings [*sic*] charged with a crime sometimes makes it difficult for one to objectively evaluate the evidence against them and what would be in their best interests. [¶] Do you understand that?

"THE DEFENDANT: Yes, your Honor.

"THE COURT: Does that make sense?

"THE DEFENDANT: Yes.

"THE COURT: Okay. You understand that while I certainly will stop and clarify to make sure that you understand any legal terminology that is used, and we'll do our best to conduct the proceedings in a manner where you follow along and understand what's going on in court and are able to articulate your case and your defense to the jury, you understand you're not entitled to special treatment or privileges?

"When I rule on questions that are asked or answers that may be giv[en], when I instruct the jury to the law, I have to follow the law with respect to all of those. I can't, if you will, put a thumb on the scale in your favor or give you anything [in] that regard. [¶] Do you understand that?

"THE DEFENDANT: Yes, your Honor."

In this case, defendant was made aware of the dangers and disadvantages of self-representation. The record as a whole demonstrates defendant understood the disadvantages and associated risks. One of those risks involved the potential of a 41-year

23.

prison sentence. We think it likely that after defendant realized his machinations had all but come to an end, he opted to take the guaranteed four-year prison term.

In conclusion, following our independent review, we have determined defendant knowingly and intelligently waived his right to counsel. The waiver is valid and no error occurred.

**DISPOSITION**

The judgment is affirmed.

_____
PEÑA, J.

WE CONCUR:


_____
CORNELL, Acting P.J.


_____
FRANSON, J.

24.