Filed 8/30/22  P. v. Villareal CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B309142 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA444273) |
| v. | |
| JOSE MANUEL VILLAREAL, | |
| Defendant and Appellant. | |

APPEAL from a judgment and an order of the Superior Court of Los Angeles County, Leslie Swain and Robert C. Vanderet, Judges.  Reversed.

Cynthia Grimm, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Scott A. Taryle and Chung L. Mar, Deputy Attorneys General, for Plaintiff and Respondent.

_____

In a previous opinion, we conditionally reversed defendant and appellant Jose Manuel Villareal's attempted murder (Pen. Code, §§ 187, subdivision (a), 664)[1] conviction on the ground that the prosecution voluntarily dismissed the case twice before proceeding to trial. Such conviction is valid only if at least one of the two dismissals was "due solely to excusable neglect" (§ 1387.1, subd. (a)), and in this case, the court had not made any finding on this question when the issue was first before us. We thus remanded for the court to do so. On remand, the trial court found that both of the dismissals were due solely to excusable neglect.

Villareal now contends that the trial court erred in its findings of excusable neglect and that the delay of his trial also violated his constitutional right to a speedy trial. He further contends that his attempted murder conviction is invalid because it was based on the natural and probable consequences doctrine, which is no longer a valid theory of attempted murder following the enactment of Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Stats. 2018, ch. 1015) and Senate Bill No. 775 (2021–2022 Reg. Sess.) (Stats. 2021, ch. 551), and that retrial is barred because the record does not contain substantial evidence to support his guilt under a theory that remains valid. Finally, he contends that we must reverse his gang enhancement and related firearm enhancement in light of Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Stats. 2021, ch. 699), which created stricter standards for such enhancements.

---

[1] Subsequent unspecified statutory references are to the Penal Code.

We agree with Villareal that his attempted murder conviction must be reversed, but we agree with the Attorney General that the case may be retried upon remand. We also agree that the gang enhancement and related firearm enhancement are no longer valid following the enactment of Assembly Bill No. 333, and we reverse those enhancements, but as Villareal concedes, they may be retried. Lastly, we disagree with Villareal as to the findings of excusable neglect.

## FACTS AND PROCEEDINGS BELOW

We repeat the facts of the case as we described them in the first opinion in this case, *People v. Villareal* (Feb. 7, 2020, B291257) [nonpub. opn.] (*Villareal*).

"At around 3:30 a.m. on January 25, 2016, a man named Johnny Aguilar saw two men standing next to his brother's car. It was dark outside, and one of the men stood by the driver's side with a skeleton mask partially obscuring his face. The man in the mask tried to open the driver's side door of the car. Aguilar said it was his brother's car and asked the men what they were doing. The man on the driver's side pulled out a gun, and Aguilar said, '[I]f you're going to shoot, you better shoot.' The man then shot him two or three times. The shots hit Aguilar in one of his testicles and his leg. He went to the hospital, where doctors removed the injured testicle.

"Aguilar told police that he recognized the man who shot him as someone named Pelon. He later identified the man in a photo lineup as Tommy Reyes. Aguilar knew the other man, who was standing by the passenger side of the car, as Little Tweety. Aguilar later identified a photo of Villareal from a lineup as Little Tweety. Aguilar told police that he knew the two men because they had tried to break into his home a few months earlier. At

3

trial, however, Aguilar denied that he could identify Reyes as the shooter or Villareal as the other man who had been present. He also testified that he did not remember telling the police that he knew who shot him.

"Aguilar testified that the man at the passenger side of the car just stood there and that he did not see him do anything. Similarly, in an interview with police shortly after the shooting, Aguilar said that Villareal 'was just following' Reyes and did not say or do anything. He stood on the sidewalk and did not try to get in the car.

"The prosecution played for the jury a recording of a jailhouse telephone conversation between Villareal and a friend. In that conversation, Villareal told the friend that he told police he did not know 'Tommy,' presumably referring to his codefendant Reyes. Villareal also said, apparently in reference to Aguilar, 'they gave that dude some photos of ours, of the entire neighborhood, and [told] him to point out the faces that did it.' Villareal then encouraged his friend to intimidate Aguilar about giving information to police in the case. He told his friend to 'tell . . . that dude to not, you know—to not point at my face, dude, because if not, it's going to go . . . fucking bad for him.' '[T]ell that dude to remove my fucking face from there, dude.' The friend told Villareal that he was going to 'go do that shit right now.'

"The parties stipulated that Villareal was a member of the Loco Park gang, and that his codefendant Reyes was a member of the Burlington Loco gang. A police gang expert testified that the two gangs are allies, and that a hypothetical shooting of the kind that occurred here would have been for the benefit of a street gang."

In addition to attempted murder, the jury also convicted Villareal of one count of assault with a firearm, in violation of section 245, subdivision (a)(2). On both counts, the jury found true an allegation Villareal committed the crimes for the benefit of a criminal street gang. (§ 186.22, subd. (b)(1)(C).) With respect to the attempted murder count, the jury found that a principal personally and intentionally discharged a firearm, proximately causing great bodily injury. (§ 12022.53, subds. (d) & (e)(1).)

The trial court sentenced Villareal to an aggregate sentence of 15 years, consisting of the low term of five years for attempted murder, plus 10 years for the gang enhancement. The court struck the firearm enhancement for purposes of sentencing. The court also imposed the low term of two years on count 2 but stayed the sentence pursuant to section 654.

In Villareal's first appeal, we reversed his conviction of assault with a firearm and conditionally reversed the attempted murder conviction on the ground that the prosecution had voluntarily dismissed the case twice before proceeding to trial. (See § 1387.) Because attempted murder is a violent felony as defined in section 667.5, the prosecution is "permitted one additional opportunity to refile charges where either of the prior dismissals . . . were due solely to excusable neglect." (§ 1387.1.) We remanded the case to the trial court to determine if either of the previous dismissals met that definition. (See *Villareal, supra*, B291257.)

The Supreme Court granted Villareal's petition for review on the question of the validity of his attempted murder conviction in light of recent legislation regarding the natural and probable consequences doctrine, but Villareal asked the court to remand

5

the case to allow the trial court to make a finding on excusable neglect. The Supreme Court granted the motion and transferred the case to this court with directions to vacate our previous opinion and rule on Villareal's motion for limited remand. We granted the motion and remanded the case to the trial court.

On remand, Villareal filed a motion to dismiss the case on the basis of the two prior dismissals. The trial court found that both prior dismissals were due solely to excusable neglect and reinstated Villareal's conviction of attempted murder.

## DISCUSSION

### A. *Villareal's Attempted Murder Conviction Must Be Reversed*

Villareal contends that we must reverse his conviction for attempted murder because it was based on the natural and probable consequences doctrine, a theory no longer valid following the enactment of Senate Bills No. 1437 and No. 775. The Attorney General concedes the point, and we agree.

In 2018, the Legislature enacted Senate Bill No. 1437, which amend section 188 to provide that, with one exception not relevant here, "in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime." (§ 188, subd. (a)(3), as amended by Sen. Bill No. 1437 (2017–2018 Reg. Sess.).) The natural and probable consequences doctrine allowed a defendant to be convicted of murder based on his intent to commit a target offense, with no proof of his mens rea as to murder. (*People v. Chiu* (2014) 59 Cal.4th 155, 164 (*Chiu*).) Thus, Senate Bill No. 1437 abolished the natural

6

and probable consequences doctrine in cases of murder. (*People v. Gentile* (2020) 10 Cal.5th 830, 846 (*Gentile*).)

When Villareal sought to overturn his attempted murder conviction in his first appeal, we rejected the argument on the ground that " '[a]n attempt is an offense "separate" and "distinct" from the completed crime.' " (*People v. Lewis* (2006) 146 Cal.App.4th 294, 298.)  Because section 188, subdivision (a)(3) mentioned only murder, we held that it did not apply to attempted murder.

There was a second obstacle, which we did not rely on in our first opinion but which also would have barred Villareal from obtaining relief.  Although ameliorative laws ordinarily apply retroactively to all defendants whose cases are not yet final on appeal when the legislation becomes effective, that presumption does not apply "when ameliorative legislation sets out a specific mechanism as the exclusive avenue for retroactive relief." (*Gentile, supra*, 10 Cal.5th at p. 852.)  Senate Bill No. 1437 contained such a mechanism in the former section 1170.95, now renumbered as section 1172.6, which allowed defendants convicted of murder under a theory made invalid by the new law to petition for resentencing.  The Supreme Court in *Gentile* held that defendants convicted of murder under the natural and probable consequences doctrine therefore could not challenge their convictions on direct appeal.  (*Gentile, supra*, at p. 859.)

After we decided Villareal's first appeal, the Legislature swept away both of these obstacles by enacting Senate Bill No. 775.  The legislation expanded eligibility for resentencing under section 1172.6 to those "convicted of . . . attempted murder under the natural and probable consequences doctrine." (Stats. 2021, ch. 551, § 2) [amending former § 1170.95, subd. (a),

7

now renumbered § 1172.6, subd. (a)].)  It also abrogated *Gentile* by enacting section 1172.6, subdivision (g), which provides that "[a] person convicted of murder, attempted murder, or manslaughter whose conviction is not final may challenge on direct appeal the validity of that conviction based on the changes  made to Sections 188 and 189 by Senate Bill [No.] 1437." (Stats. 2021, ch. 551, § 2.)  Furthermore, although Senate Bill No. 775 did not amend section 188, the Legislature's "[c]larifi[cation]  that persons who were convicted of attempted murder or manslaughter under a theory of felony murder and the natural probable consequences doctrine are permitted the same relief as those persons convicted of murder under the same theories" (Stats. 2021, ch. 551, § 1) shows unequivocally that the Legislature intended to eliminate the natural and probable consequences doctrine for attempted murder just as with murder.

Thus, under the law as amended by Senate Bill No. 775, the natural and probable consequences doctrine can no longer support a conviction for attempted murder (see § 1172.6, subd. (a)), and this change in the law applies retroactively to defendants like Villareal whose convictions are not yet final.  (See *People v. Hola* (2022) 77 Cal.App.5th 362, 370 (*Hola*).)  Because the jury instructions regarding attempted murder at Villareal's trial included an instruction on the natural and probable consequences doctrine, "we will treat the instruction[s]  as having been 'legally erroneous at the time [they were] given' (*Gentile, supra*, 10 Cal.5th at p. 851), and we will proceed to 'assess whether the error was harmless beyond a reasonable doubt' under *Chapman* [*v. California* (1967) 386 U.S. 987]." (*People v. Birdsall* (2022) 77 Cal.App.5th 859, 868, fn. omitted.)

In the instant case, the court instructed the jury on attempted murder under theories of direct aiding and abetting as well as the natural and probable consequences doctrine. "When a trial court instructs a jury on two theories of guilt, one of which was legally correct and one legally incorrect, reversal is required unless there is a basis in the record to find that the verdict was based on a valid ground." (*Chiu*, *supra*, 59 Cal.4th at p. 167.) If "the record does not permit us to rule out a reasonable possibility that the jury relied on the invalid natural and probable consequences theory in convicting" the defendant, the error was prejudicial. (*In re Martinez* (2017) 3 Cal.5th 1216, 1226.) The error here does not meet this strict standard of harmless error. Virtually all the evidence of Villareal's culpability for attempted murder was under the natural and probable consequences doctrine. Thus, as both parties agree, we must reverse Villareal's attempted murder conviction.

### B. *The Prosecution Is Not Barred from Retrying Villareal for Attempted Murder on Remand*

Although the parties agree that we must reverse Villareal's conviction of attempted murder, they disagree as to the consequences. Villareal argues that because the prosecution failed to produce substantial evidence of his guilt of attempted murder as a direct aider and abettor, retrial on that theory is barred. The Attorney General contends that because the natural and probable consequences doctrine was valid at the time of trial, we must allow a retrial. We agree with the Attorney General.

The ordinary rule is that "[w]hen there has been a postconviction change in the statutory or decisional law that invalidates a theory upon which the conviction was based and reversal is warranted, appellate courts remand the case to the

trial court to allow the prosecution to retry the defendant on a legally valid theory." (*Hola, supra*, 77 Cal.App.5th at p. 371.) A retrial in this situation does not violate the prohibition against double jeopardy. As the United States Supreme Court has explained, " '[t]o require a criminal defendant to stand trial again after he has successfully invoked a statutory right of appeal to upset his first conviction is not an act of governmental oppression of the sort against which the Double Jeopardy Clause was intended to protect.' " (*United States v. DiFrancesco* (1980) 449 U.S. 117, 131.)

Villareal contends that his case is different because there is no substantial evidence of his guilt under any valid theory. The natural and probable consequences doctrine has been invalidated, and there is virtually no evidence that he directly aided and abetted Reyes in the attempted murder. According to Villareal, because the prosecution had every incentive to present evidence under both theories, its failure to produce sufficient evidence under the remaining valid theory of liability bars a second chance.

We disagree. Even if the record does not contain sufficient evidence of Villareal's guilt as a direct aider and abettor, retrial is not barred. Although the jury was instructed on two theories, the prosecution was entitled to devise a legal strategy focusing on the evidence that it believed would most probably lead to a conviction. Whether it is likely that the prosecution will be able to produce new evidence that Villareal aided and abetted Reyes in attempted murder is not determinative; as a reviewing court, we are in no position to speculate on what evidence may exist outside the record in any given case. As the court noted in *Hola*, "the People also have a right to due process." (*Hola, supra*,

10

77 Cal.App.5th at p. 376, fn. 15, citing Cal. Const., art I, § 29.) The prosecution obtained a valid conviction under the law that existed at the time. When a conviction is invalidated by a change in the law, it is entitled to another chance.

### C. *The Trial Court Did Not Abuse Its Discretion by Determining that the June 12, 2017 Dismissal Was Due Solely to Excusable Neglect*

Villareal contends that the trial court erred by denying his motion to dismiss his attempted murder charge on the ground that the case had previously been dismissed twice.[2] We disagree. The trial court did not abuse its discretion in determining that the June 2017 dismissal was due solely to excusable neglect (see *People v. Woods* (1993) 12 Cal.App.4th 1139, 1149 (*Woods*)), and substantial evidence supports the court's implied factual findings on the issue (see *In re White* (2020) 9 Cal.5th 455, 470 (*White*)).

#### 1. Legal Principles

Section 1387 provides that "[a]n order terminating an action . . . is a bar to any other prosecution for the same offense if it is a felony . . . and the action has been previously terminated." (§ 1387, subd. (a).) An exception to this rule exists for violent felonies: In such cases, even though "the prosecution has had two prior dismissals, as defined in Section 1387, the people shall be permitted one additional opportunity to refile charges where

---

[2] This issue is not moot despite our holding elsewhere in this opinion that Villareal's attempted murder conviction must be reversed. If neither of the prior dismissals was due to excusable neglect, the case against Villareal would be dismissed, with no opportunity to retry him on remand.

11

either of the prior dismissals under Section 1387 were due solely to excusable neglect." (§ 1387.1, subd. (a).)

" 'Excusable neglect' is a legal term of art common in the law. Appellate courts have held that the phrase is to be given the same construction in criminal cases as it has previously been given in civil cases. [Citation.] 'Simply expressed, "[e]xcusable neglect is neglect that might have been the act or omission of a reasonably prudent person under the same or similar circumstances." ' " (*People v. Massey* (2000) 79 Cal.App.4th 204, 210–211 (*Massey*).)

"The application of section 1387.1 is a discretionary decision for the judge which should be afforded great weight unless a clear abuse of that discretion is demonstrated. We do not exercise ' "independent review." ' " (*Woods, supra*, 12 Cal.App.4th at p. 1149.) "Thus, '[u]nless *inexcusable* neglect is clear, the policy favoring trial on the merits prevails.' " (*Massey, supra*, 79 Cal.App.4th at p. 211.) We review the factual findings underlying the trial court's decision for substantial evidence. (*White, supra*, 9 Cal.5th at p. 470.)

### 2.    Procedural History

On November 28, 2016, prior to Villareal's trial, the prosecutor told the court that he was unable to proceed with the case at that time. Both parties agreed to dismiss the case and deem it to be refiled under the existing information pursuant to section 1387.2, with a new deadline to begin trial of January 27, 2017. On January 10, 2017, the trial court granted the prosecution's motion to consolidate Villareal's case with

that of his codefendant, Reyes, under a new information.[3]  On the new trial date, June 12, 2017, the prosecution again was not prepared to proceed, and dismissed and refiled the case for a second time.[4]  Villareal's attorney asked the trial court to determine whether one of the dismissals had been for excusable neglect, but the court declined to do so.  The case then proceeded to trial in August 2017.

Because the court did not make a finding of excusable neglect, in our prior opinion we conditionally reversed Villareal's attempted murder conviction and remanded the case to the trial court to make such a finding.[5]

---

[3] The filing of the consolidated information rendered the previous information redundant.  In our previous opinion, we held that this consolidation of the cases was not a dismissal of the previous information for purposes of section 1387 on the ground that "[i]n general, courts have *not* considered dismissals of duplicative accusatory pleadings to be terminations of actions within the scope of section 1387." (*Berardi v. Superior Court* (2008) 160 Cal.App.4th 210, 220.)  This is because the dismissal of a duplicative pleading "involving the same facts does not involve the defendant in the kind of successive prosecutions that section 1387 was designed to prevent." (*People v. Cossio* (1977) 76 Cal.App.3d 369, 372.)  Villareal asks us to reconsider our position, but we reach the same conclusion as before.

[4] As before, the parties agreed to act pursuant to section 1387.2, which allows the court to proceed under the existing pleading, with the case deemed to have been terminated and refiled.

[5] In our prior opinion, we also reversed Villareal's conviction for assault with a firearm.  That offense is not classified as a violent felony, at least as applied to a defendant

13

On remand, the prosecution submitted declarations from a deputy district attorney, two members of the Los Angeles Police Department, and an investigator for the district attorney. The deputy district attorney stated that he decided to dismiss the case in November 2016 in order to join Villareal's case with Reyes's case in a single prosecution, and that he dismissed it again in June 2017 because his investigators and police officers were unable to serve the sole eyewitness in the case, Aguilar, with a subpoena to require him to testify.

In their declarations, the police officers and investigator detailed their efforts to find Aguilar. A police detective declared that although Aguilar initially cooperated with police, identifying both Villareal and Reyes as the perpetrators shortly after the attack in January 2016, he soon ceased cooperating. At the July 2016 preliminary hearing, he refused to identify Villareal and Reyes and claimed that he no longer remembered the details of his prior identification of them. Transcripts of jailhouse phone calls suggested that both Villareal and Reyes instructed associates to dissuade Aguilar from testifying.

Police officers began attempting to serve Aguilar with a subpoena in early June 2017, coming to his home at least three times in the days leading up to the June 12 dismissal. On at least one occasion, an investigator went to Aguilar's home at

_____

who did not personally fire the weapon. (*People v. Sinclair* (2008) 166 Cal.App.4th 848, 856; see § 667.5, subd. (c).) Because it is not subject to the violent felony exception in section 1387.1, we reversed the conviction for assault with a firearm outright, with no opportunity for the prosecution to retry it. The Attorney General does not challenge that outcome, and we reinstate it in this opinion.

5:00 a.m. in an attempt to find him before he left for work. A detective ultimately served Aguilar a month later early in the morning in his bedroom.  Even then, he refused to sign the subpoena and attempted to use a chair as a barricade between himself and the detective.  Officers ultimately arrested Aguilar in July 2017 pursuant to a body attachment to bring him to court.

On the basis of this evidence, the trial court determined that both prior dismissals were for excusable neglect.[6]

### 3.    Application to the Case

Villareal contends that the June 2017 dismissal was not due solely to excusable neglect.  He notes several ways in which the police and investigators could have pursued Aguilar more diligently.  They could have started looking for him earlier, they could have attempted to find him at work or other locations apart from his home, and they could have enlisted the help of others. Villareal is correct that the effort to locate Aguilar was not perfect.  But the concept of excusable neglect assumes some level of negligence (*Massey*, *supra*, 79 Cal.App.4th at p. 211), so long as

---

[6] Villareal notes that the prosecution argued only that the June 2017 dismissal was due to excusable neglect, and did not attempt to demonstrate that the November 2016 dismissal was also due to excusable neglect.  Because section 1387.1, subdivision (a) allows the prosecution to refile charges if "either" of the prior dismissals was due solely to excusable neglect, we need not consider whether the trial court erred by determining that the November 17, 2016 dismissal was also due solely to excusable neglect.  Nor do we need to address Villareal's contention that the trial court violated his right to due process by ruling on the November 17, 2016 dismissal without allowing him an opportunity to contest the issue.

it does not exceed what " ' " 'a reasonably prudent person under the same or similar circumstances' " ' " might do.  (*Miller v. Superior Court* (2002) 101 Cal.App.4th 728, 741.)  Nothing about the officers' and investigator's actions here suggests bad faith or extreme negligence required to overcome the strong presumption in favor of the trial court's ruling.

Villareal also notes several small errors in the trial court's characterization of the facts.  The court stated that an investigator began attempting to serve Aguilar with a subpoena in late May, when the evidence indicated this did not actually occur until early June.  The court stated that the investigator went to Aguilar's home at 5:00 a.m. and waited at least an hour on three occasions, when the investigator's declaration indicates that he went to Aguilar's home at 5:00 a.m. once and waited at least an hour twice.  These errors are simply too minor to call into question the trial court's exercise of its discretion.

Finally, Villareal notes that the prosecutor did not inform the court that the June 12, 2017 dismissal was necessary because of an inability to locate Aguilar.  Instead, in the days leading up to that request, he told the court that he needed to reschedule because of a conflict with another case.  But even if a prosecutor's scheduling conflicts do not constitute good cause for delaying a trial under section 1382 (*Batey v. Superior Court* (1977) 71 Cal.App.3d 952, 957–958), we do not agree that they constitute the clear inexcusable neglect sufficient to overcome the presumption in favor of trial on the merits.  (See *Massey, supra*, 79 Cal.App.4th at p. 211.)

16

**D.** *The Dismissals and Continuances Did Not Violate Villareal's Right to a Speedy Trial*

Villareal contends that the trial court violated his constitutional right to a speedy trial by allowing the prosecution to delay the trial by approximately 18 months, from February 17, 2016, when he was arrested, until August 10, 2017, when the trial began. We disagree.

"The Sixth Amendment to the federal Constitution, as applied to the states through the due process clause of the Fourteenth Amendment [citation], guarantees a criminal defendant the 'right to a speedy and public trial.' " (*People v. Harrison* (2005) 35 Cal.4th 208, 225.)[7] The United States Supreme Court in *Barker v. Wingo* (1972) 407 U.S. 514 (*Barker*) established a balancing test for determining whether a defendant is entitled to relief for a violation of this right, consisting of four factors: "Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." (*Id.* at p. 530.)

"The length of the delay is to some extent a triggering mechanism. Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." (*Barker*, *supra*, 407 U.S. at p. 530.) The level of delay required to become presumptively prejudicial varies based on the complexity of the case (*id.* at p. 531), but "courts have generally found postaccusation delay 'presumptively prejudicial' at least as it approaches one year." (*Doggett v. United States* (1992) 505 U.S. 647, 652, fn. 1 (*Doggett*).) Both sides in

---

[7] Article I, section 15 of the California Constitution also guarantees the right to a speedy trial, but Villareal's argument here is based only on the federal Constitution.

this case agree that the 18-month delay between Villareal's arrest and the beginning of the trial is presumptively prejudicial.

"Closely related to length of delay is the reason the government assigns to justify the delay. . . . [D]ifferent weights should be assigned to different reasons. A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay." (*Barker*, *supra*, 407 U.S. at p. 531, fn. omitted.) In this case, there is no evidence that the prosecution deliberately delayed the trial to hamper the defense. Instead, the two main delays were for valid reasons. The prosecution first delayed the trial in order to try Villareal and Reyes jointly. " ' "Joint trials are favored because they 'promote [economy and] efficiency' and ' "serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts." ' " ' " (*People v. Flinner* (2020) 10 Cal.5th 686, 713 (*Flinner*).) The second delay was due to the inability to serve Aguilar with a subpoena to require him to testify in time for the June 2017 deadline. The United States Supreme Court in *Barker* cited a missing witness as an example of a valid reason for delay. (*Barker*, *supra*, at p. 531.) Villareal argues that government negligence in failing to apprehend Reyes and subpoena Aguilar exacerbated these delays. To the extent negligence contributed to the delays, it was a "more neutral" factor that weighs somewhat

18

against the government because "the ultimate responsibility for such circumstances must rest with the government."  (*Ibid*.)

The third factor is "the defendant's responsibility to assert his right" to a speedy trial.  (*Barker*, *supra*, 407 U.S. at p. 531.)  "The defendant's assertion of his speedy trial right . . . is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right," but "failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial."  (*Id*. at pp. 531–532.)  A defendant does not forfeit his right to a speedy trial by remaining silent, but if he agrees to a continuance, he waives "his right to a speedy trial for the period covered by each continuance." (*People v. Seaton* (2001) 26 Cal.4th 598, 634.)  In this case, the record indicates that Villareal personally waived time once, on February 6, 2017.  Otherwise, he mostly remained silent and did not assert his right to a speedy trial.  Villareal contends that his attorney objected to the prosecution's request to dismiss and refile the case in June 2017, but the record shows that the attorney asked the court to determine whether one of the prior dismissals was for excusable neglect.  The court declined to do so, believing that the case had not previously been dismissed and refiled.  The court asked, "[Do] you stipulate pursuant to [section] 1387.2?"[8]  Villareal's attorney responded, "Yes.  But I do object."  In context, it appears that the objection was to the decision to proceed without making a finding of excusable neglect, not to the denial of a speedy trial.

---

[8] Section 1387.2 allows the court, with the consent of both parties, to proceed on an existing pleading rather than issue an order terminating an action and requiring the prosecution to re-file.

The fourth factor is prejudice to the defendant. The United States Supreme Court in *Barker* identified three interests the right to a speedy trial is designed to protect: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired. Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." (*Barker, supra*, 407 U.S. at p. 532, fn. omitted.) Villareal contends that the delay prejudiced him because it resulted in the joinder of his case with Reyes's. But as we noted above, the law favors joint trials when possible. (*Flinner, supra*, 10 Cal.5th at p. 713.)

When we consider all four parts of this balancing test, we must conclude that Villareal did not suffer a denial of his constitutional right to a speedy trial. The 18-month delay did not extend much "beyond the bare minimum needed to trigger judicial examination of the claim." (*Doggett, supra*, 505 U.S. at p. 652.) It is far from "the extraordinary 8 1/2-year lag" (*ibid*.) that led the United States Supreme Court to grant the defendant relief in *Doggett* without a showing of particularized trial prejudice. (*Id*. at p. 657.) Furthermore, although the delay was caused in some small part by government negligence, most of the delay was "inevitable and . . . justifiable" (*id*. at p. 656) in light of the difficulty in locating Villareal's codefendant and in compelling the key prosecution witness to appear in court. And although Villareal did not assent to the bulk of the delay, neither did he object and press the court to move forward faster with his trial.

20

### E.    *The Enhancements Must Be Stricken*

Villareal contends that we must reverse his gang enhancement in light of Assembly Bill No. 333 (2021–2022 Reg. Sess.), which amended section 186.22 to impose new substantive and procedural requirements for gang allegations. The Attorney General agrees, as do we.

A gang enhancement under section 186.22 requires proof that the defendant committed an enumerated felony "for the benefit of, at the direction of, or in association with a criminal street gang." (§ 186.22, subd. (b)(1).)  The statute defines "criminal street gang" as a group of people who, among other things, "collectively engage in, or have engaged in, a pattern of criminal gang activity." (§ 186.22, subd. (f).)  Assembly Bill No. 333 amended section 186.22 in two ways relevant to this appeal.  First, it added a new subdivision (g), which provides that "to benefit, promote, further, or assist means to provide a common benefit to members of a gang where the common benefit is more than reputational."  It also restricted the definition of "pattern of criminal gang activity." (§ 186.22, subd. (e)(1).)  Now, the prosecution must prove that gang members committed two predicate offenses within three years of the current offense that benefitted the gang in a way that "is more than reputational." (*Ibid*.)  These aspects of the law apply retroactively to all cases not yet final when the law became effective. (*People v. Sek* (2022) 74 Cal.App.5th 657, 667 (*Sek*).)

Villareal's trial predated the enactment of Assembly Bill No. 333, so the jury instructions do not reflect the new law.  The Attorney General concedes that the gang expert at Villareal's trial relied primarily on the reputational benefit to the defendants' gangs in his testimony in support of the gang

21

enhancement. Thus, the error in the instructions was not harmless, and we must reverse the imposition of the enhancement. (See *Sek*, *supra*, 74 Cal.App.5th at p. 668.) The firearm enhancement was also based on Villareal's participation in a criminal street gang (see § 12022.53, subd. (e)(1)(A)), and it too must be reversed. The prosecution will have the option to retry the enhancements upon remand. (See *Sek*, *supra*, at p. 669.)

### F. *Issues Raised in the Previous Opinion*

Villareal does not renew several arguments he made in his first appeal, including those relating to the denial of his motion for a new trial, the jury instructions, prosecutorial error, inefficient assistance of counsel, and cumulative error. These arguments are largely moot in light of subsequent changes in the law requiring us to reverse his attempted murder conviction. To the extent they are not moot, we reject them for the same reasons we rejected them previously.

## DISPOSITION

Appellant's convictions of attempted murder and assault with a firearm are reversed, as are the enhancements. The matter is remanded, and the prosecution may elect to retry appellant for attempted murder and the enhancements. The prosecution may not retry appellant for assault with a firearm.

NOT TO BE PUBLISHED.

ROTHSCHILD, P. J.

We concur:

CHANEY, J.

BENKE, J.*

---

*Retired Associate Justice of the Court of Appeal, Fourth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.